S01P1069. LUCAS v. THE STATE.
(555 SE2d 440)

FLETCHER, Chief Justice.

Daniel Anthony Lucas was found guilty by a jury on three counts of malice murder, three counts of felony murder, two counts of burglary, and one count of kidnapping with bodily injury.[1] The jury

---

[1] This is the companion case to *Rhode v. State*, 274 Ga. 377 (552 SE2d 855) (2001). The crimes were committed on April 23, 1998. Lucas was indicted by a Jones County grand jury on June 30, 1998, on three counts of malice murder, three counts of felony murder, two counts of burglary, and one count of kidnapping with bodily injury. The State filed written notice of its intent to seek the death penalty on December 18, 1998. Lucas's trial began on September 8, 1999, and he was found guilty on all counts on September 16, 1999. The felony murder verdicts were vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993); OCGA § 16-1-7 (a) (1). The jury fixed Lucas's sentences for each of the murders at death on September 17, 1999. That same day the trial court imposed three death sentences for the three murders in conformity with the jury's sentencing verdicts and further imposed consecutive terms of life imprisonment for the kidnapping with bodily injury and twenty years for each of the two burglaries. Lucas filed a motion for new trial on October 1, 1999, and amended that motion on August 17, 2000, and again on December 8, 2000. The trial court denied the motion for new trial in an order filed on February 15,

found beyond a reasonable doubt that the murder of Bryan Moss was committed while Lucas was engaged in the murder of Kristin Moss, that it was committed while Lucas was engaged in a burglary, that it was committed while Lucas was engaged in a kidnapping with bodily injury, and that it was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind.[2] The jury found beyond a reasonable doubt that the murder of Kristin Moss was committed while Lucas was engaged in the murder of Steven Moss and while Lucas was engaged in a burglary.[3] The jury found beyond a reasonable doubt that the murder of Steven Moss was committed while Lucas was engaged in the murder of Bryan Moss and while Lucas was engaged in a burglary.[4] The jury fixed the sentence for each of the murders at death. For the reasons that follow, we affirm the convictions and sentences in this case.

1. The evidence adduced at trial, which included Lucas's videotaped confession to investigators and testimony regarding his inculpatory statement to a friend, showed the following. Lucas and Brandon Joseph Rhode burglarized the home of Steven and Gerri Ann Moss twice on April 23, 1998. During the second burglary of the Moss home, 11-year-old Bryan Moss returned home from school. Lucas and Rhode confronted Bryan and forced him to sit in a chair, and then Lucas fired at Bryan with a .25 caliber handgun, inflicting a nonfatal wound to his upper arm and shoulder. Lucas led Bryan to a bedroom where he shot the boy repeatedly with the .25 caliber handgun. In the meantime, Rhode met 15-year-old Kristin Moss as she arrived from school, placed her in a chair, and shot her twice with a .357 caliber handgun. Rhode then shot Steven Moss four times with the .357 caliber handgun as Steven arrived home. Finally, Lucas obtained a .22 caliber handgun from Rhode's automobile and shot Bryan and Kristin Moss both again. Both Bryan and Kristin as well as their father Steven Moss died as a result of any number of these gunshot wounds inflicted by Lucas.

Several witnesses observed Rhode's automobile as Lucas and Rhode fled in it from the Mosses' home. One of these witnesses identified Lucas as the passenger in the automobile. A search of the automobile revealed a recently-used spare tire and damage to both the front and rear bumpers. The damage to the bumpers was shown to be consistent with damage to a propane tank and a cinder block at the Mosses' home. Expert testimony demonstrated that paint left on the

---

2001. Lucas filed a notice of appeal on March 14, 2001, and his appeal was docketed in this Court on April 18, 2001, and orally argued on June 11, 2001.

[2] See OCGA § 17-10-30 (b) (2) and (7).

[3] See OCGA § 17-10-30 (b) (2).

[4] Id.

cinder block matched the paint on Rhode's automobile. Further expert testimony showed that an impression left in the Mosses' dirt driveway could have been made by the spare tire.

We conclude, viewing the evidence adduced at the guilt/innocence phase of Lucas's trial in the light most favorable to the jury's verdict, that the evidence was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that Lucas was guilty on all charges.[5]

## Victim Impact Comments and Testimony

2. Lucas contends that certain comments during the State's opening statement and certain testimony during the guilt/innocence phase of the trial improperly raised the worth of the victims and the impact wrought by their deaths. We conclude that the trial court erred in allowing the comments and testimony in question, but we also conclude that the error was harmless beyond a reasonable doubt.

(a) Lucas filed a pretrial motion for an order barring the introduction of victim worth and victim impact evidence entirely or, alternatively, for a pretrial hearing for the purpose of reviewing and limiting such evidence. The State agreed that it would not seek to introduce any such evidence. Nevertheless, the State's opening statement, almost at its very beginning, made reference to Bryan Moss's being "an A-B student" and to his having made the "All-Star team every year," as well as to Kristin Moss's having been voted "most likely to succeed" by her classmates. The State also noted in its opening statement that the Moss family "had been through some hard times" but that "finally life was looking good for them" in light of Steven Moss's recent success in his own trucking business. Lucas objected to the State's opening statement and moved for a mistrial, but the trial court ruled that the State's remarks were not improper. After the trial court overruled Lucas's renewed objection and denied his request for a hearing to voir dire the testimony of Gerri Ann Moss, the State purposefully elicited testimony from Ms. Moss about Bryan's and Kristin's being "good students" and "good kids," about Bryan's excelling at football, and about Kristin's being voted most likely to succeed. The State also purposefully elicited testimony about Steven's trucking business and about how Steven and Bryan liked to fish. When the State's second witness, Cary Moss, began testifying further about Steven Moss's trucking business, Lucas again objected on grounds that the testimony was improper. The trial court overruled the objection on grounds related to victim impact and vic-

---

[5] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

tim worth but sustained the objection on the ground that the testimony was not relevant.

(b) Georgia law authorizes the admission of evidence regarding "the victim's personal characteristics and the emotional impact of the crime on the victim, the victim's family, or the community" in a death penalty trial, but such evidence is admissible only *"subsequent to* an adjudication of guilt. . . ."[6] Even when such evidence is to be introduced at the sentencing phase, trial courts are to use great caution in ensuring that the rights of the defendant are secured.[7] In Lucas's case such evidence was improperly admitted during the guilt/innocence phase of the trial, despite his repeated objections.

Some information about victims can offer jurors "those details of context that allow them to understand what is being described"[8] in the guilt/innocence phase, and, accordingly, we have held that "incidental characterizations" of a victim are not improper in the guilt/innocence phase when they are necessary to show something sufficiently relevant.[9] However, upon our review of the record in Lucas's case, we are unable to say that the opening statements and testimony described above concerning Bryan and Kristin Moss were relevant at all to the question of Lucas's guilt or innocence. Some limited information regarding Steven Moss's business might have had some relevance to the timing of his arrival at home on the day of the murders and his possessing some money that apparently was removed from his wallet after his murder. However, even this information was first introduced in the State's opening statement in the unnecessary context of the Moss family's going through "some hard times. . . ." We conclude, therefore, that the trial court erred by allowing improper reference to victim impact in the State's opening statement and in the testimony of the first two witnesses.

(c) Although we conclude that the trial court erred in overruling Lucas's objections to victim impact references in the State's opening statement and in the testimony of two witnesses, we need not reverse Lucas's convictions and sentences, because the error was harmless beyond a reasonable doubt. The comments and testimony in question would have been admissible in the sentencing phase, and, therefore, our analysis of possible harm is limited to any harm that might have been suffered in the guilt/innocence phase. We note that Lucas had confessed both to a friend, who testified at trial, and to law enforcement officers, in a videotaped confession that was played for the jury.

---

[6] OCGA § 17-10-1.2 (a) (1) (emphasis supplied).

[7] See *Turner v. State*, 268 Ga. 213, 214-215 (2) (a) (486 SE2d 839) (1997).

[8] *Payne v. Tennessee*, 501 U. S. 808, 841 (111 SC 2597, 2608, 115 LE2d 720) (1991) (Souter, J., concurring).

[9] *Butts v. State*, 273 Ga. 760, 767 (15) (546 SE2d 472) (2001).

Thus, particularly in light of the State's corroborating evidence, there was no room for any reasonable doubt that Lucas had actively participated in the murders. Although Lucas argued that he was unable to form the intent to murder, we conclude, in view of the evidence as a whole and the relevant law presented to the jury in the guilt/innocence phase charge, that the jury's consideration of that theory of defense in the guilt/innocence phase was not affected by the trial court's error. Because we conclude beyond a reasonable doubt that Lucas suffered no harm, we need not reverse his convictions or sentences.

## Pretrial Issues

3. Lucas moved for a change of venue, the State consented to the motion, and the trial court ruled that venue would be changed and informed the parties that it would select a new county for trial. Thereafter, but before a new venue had been selected by the trial court, the State moved that the jury be selected in another county and then returned to Jones County for the trial, pursuant to OCGA § 17-7-150 (a) (3). Upon our review of the record, we find no abuse of the trial court's discretion in its final ruling on venue, and we reject Lucas's contention that the trial court was not authorized to modify its ruling on the motion to change venue in the manner described here.[10]

4. Upon our review of the record, we conclude that the trial court did not err in finding that Lucas's videotaped confession was voluntarily made after he had been advised of and had waived his rights under *Miranda v. Arizona*.[11] We also conclude that the trial court did not err in concluding that the confession was not induced by "the slightest hope of benefit or remotest fear of injury,"[12] despite the comments made to him by law enforcement officers.

5. Our review of the record fails to reveal that Lucas asserted, whether by written motion or oral argument, a claim regarding an alleged violation of his Fourth Amendment rights by the manner in which he was located, transported, and questioned on April 25 and April 26, 1998. Consequently, that issue will not be considered on appeal.[13]

6. Upon our review of the record, we find that the trial court did not abuse its discretion, which under Georgia law is to be addressed directly to the question of the "ends of justice," in denying Lucas's

---

[10] See *Morrow v. State*, 272 Ga. 691, 697 (5) (a) (532 SE2d 78) (2000).
[11] 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).
[12] OCGA § 24-3-50.
[13] *Kitchens v. State*, 228 Ga. 624, 625 (1) (187 SE2d 268) (1972).

two motions for a continuance.[14]

7. The trial court did not err by denying Lucas's demurrer to the indictment against him. The indictment tracked the language of the Georgia Code, could be clearly and easily understood, and provided adequate notice of the crimes charged.[15] The statute against murder under which Lucas was indicted is not unconstitutional,[16] and this Court's recent decision[17] holding that portions of other statutes which prescribed the use of electrocution as the method of carrying out death sentences does not affect the validity of Lucas's indictment.

8. The trial court, after conducting a thorough in camera review, refused to disclose the records of treatment received by Lucas's co-defendant during the co-defendant's incarceration. Lucas argues that the records were not prepared in the course of voluntary treatment and thus were not subject to the psychiatrist-patient privilege. However, because our review of the records indicates that they were prepared in the course of treatment, we conclude that the psychiatrist-patient privilege applied to them, regardless of whether that treatment was voluntary. A plurality of this Court has held that "[i]n order to abrogate the psychiatrist-patient privilege, the [criminal] defendant must make a showing of necessity, that is, that the evidence in question is critical to his defense and that substantially similar evidence is not otherwise available to him."[18] Applying that standard, we find that the trial court did not err in failing to disclose portions of the records that reflected psychiatrist-patient communications. Pretermitting the question of whether the trial court erred by failing to disclose any of the remaining portions of the records, we find beyond a reasonable doubt that their disclosure to Lucas would not have affected the outcome of either phase of the trial.

### Remaining Guilt/Innocence Phase Issues

9. Lucas contends that the trial court erred in finding seven prospective jurors qualified to serve, namely jurors Goodman, Lacy, Brewer, McCollum, McCannon, Adams, and Stovall. We find no error. "A juror who will automatically vote for the death penalty in

---

[14] OCGA § 17-8-22; see *Johnson v. State*, 271 Ga. 375, 380 (8) (519 SE2d 221) (1999); *Burnett v. State*, 240 Ga. 681, 683-684 (1) (242 SE2d 79) (1978).

[15] OCGA § 17-7-54; *Burgeson v. State*, 267 Ga. 102, 103 (1) (475 SE2d 580) (1996); *Stewart v. State*, 246 Ga. 70, 72 (2) (268 SE2d 906) (1980).

[16] *Speed v. State*, 270 Ga. 688, 698 (48) (512 SE2d 896) (1999); *Chester v. State*, 262 Ga. 85, 88 (3) (414 SE2d 477) (1992).

[17] *Dawson v. State*, 274 Ga. 327 (554 SE2d 137) (2001).

[18] *Bobo v. State*, 256 Ga. 357, 360 (4) (349 SE2d 690) (1986) (plurality opinion); see also id. at 362 (Weltner, J., concurring specially) (stating that the psychiatrist-patient privilege should be "absolute").

every case" must be excused upon a motion by the defendant.[19] In evaluating whether a prospective juror is qualified to serve in a death penalty case, the proper inquiry " 'is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' "[20] A juror is not automatically disqualified simply because he or she expresses an initial inclination for or against the death penalty.[21] Furthermore, "it is improper to require the juror to enumerate hypothetical circumstances in which she might or might not vote to impose the death penalty"[22] or to seek to have a prospective juror prejudge the case.[23] A trial court's findings regarding a prospective juror's qualification to serve based on his or her death penalty views are examined in light of the record as a whole and are afforded due deference.[24]

Upon our examination of the voir dire of the prospective jurors challenged in this appeal, we conclude the trial court permitted sufficient voir dire of the jurors in question on the subject of their death penalty views, resolved issues arising out of contradictory voir dire responses, and did not abuse its discretion in making its finding regarding the jurors' abilities to consider all of the three sentences authorized under Georgia law in light of all of the evidence that might be presented at trial.

10. Lucas argues that the trial court erred by limiting his voir dire of prospective jurors on the subject of their willingness to consider specific items of allegedly-mitigating evidence. The trial court properly ruled that Lucas was permitted to "ask [jurors] if [they] would consider mitigating evidence" but not "to ask [them] what type of mitigating evidence" they would find compelling. We conclude that the instruction given to defense counsel and the voir dire subsequently permitted were proper in light of the prohibition against counsel's seeking to have jurors "prejudge the case"[25] based on specific, yet necessarily-incomplete facts and seeking to have jurors "enumerate hypothetical circumstances"[26] under which they would or

---

[19] *Morgan v. Illinois*, 504 U. S. 719, 729 (112 SC 2222, 119 LE2d 492) (1992).

[20] *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997), quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (II) (105 SC 844, 83 LE2d 841) (1985).

[21] *Mize v. State*, 269 Ga. 646, 652 (6) (d) (501 SE2d 219) (1998).

[22] *Carr v. State*, 267 Ga. 547, 554 (6) (a) (480 SE2d 583) (1997); see also *Gissendaner v. State*, 272 Ga. 704, 707-708 (3) (b) (532 SE2d 677) (2000).

[23] *Barnes v. State*, 269 Ga. 345, 351-352 (10) (496 SE2d 674) (1998); see also *King v. State*, 273 Ga. 258, 267 (18) (e) (539 SE2d 783) (2000) (addressing defendant's improper attempt to have prospective juror prejudge what weight she might give to a specific item of mitigating evidence).

[24] *Mize*, 269 Ga. at 652 (6) (d).

[25] *Barnes*, 269 Ga. at 351-352 (10).

[26] *Carr*, 267 Ga. at 554 (6) (a).

would not impose a given sentence.

11. Lucas contends that a juror gave untruthful responses regarding his residency, his marital status, and his criminal history. We find no grounds for granting Lucas a new trial. We have held that "[i]n order for a defendant to secure a new trial because a juror did not give a correct response to a question posed on voir dire . . . , the defendant must show that the juror failed to answer the question truthfully and that a correct response would have been a valid basis for a challenge for cause."[27] A juror's truthfulness is evaluated with due regard for the juror's understanding of the questions and for the juror's understanding of his or her own responses.[28] The motion for new trial record shows that the juror in question attempted to answer voir dire questions truthfully based on his own understanding: he was living with his sister and believed himself to be a resident of Morgan County despite his connections to another county and his plan to fully relocate there soon; he was married, his divorce was not yet final, and he had not been legally remarried; and his only adjudication of guilt was for two driving-related misdemeanors, and he had been arrested but never prosecuted for writing checks with insufficient funds to cover them. Accordingly, Lucas is not entitled to a new trial on the basis of this juror's voir dire responses. Lucas is also not entitled to a new trial on the basis of his other, related arguments that were not advanced at trial.[29]

12. Nearly two weeks before trial, the State represented to defense counsel and the trial court that it had already attempted to do a search of the criminal histories of all of the witnesses it intended to use at trial and agreed to provide those criminal histories to defense counsel along with a list of the witnesses for whom it had not been possible to perform such a search. On the third day of testimony, which was one week after jury selection had begun, the State filed a motion seeking funds to hire an expert witness to testify in rebuttal if Lucas put forward testimony regarding his alleged intoxication at the time of the murders. Lucas claims that the State suppressed exculpatory evidence in violation of *Brady v. Maryland*[30] by failing to discover and disclose the fact that the expert witness in question had previously pled guilty to a charge of sexual battery or, alternatively, by amending its notice of witnesses for whom no criminal history search had been performed.

We have previously held that the State is not required under

---

[27] *Sears v. State*, 270 Ga. 834, 840 (2) (514 SE2d 426) (1999).
[28] Id.
[29] *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992).
[30] 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

*Brady* to obtain the criminal histories of its witnesses.[31] We also reject Lucas's argument that the State should be estopped from arguing it had no duty to obtain the criminal history of the witness in question on the basis of its pretrial representation to defense counsel, because we find that the State's representation would not have been reasonably understood to apply to that witness, particularly given the timing and circumstances under which the witness's services were obtained.

13. Upon our review of the record, we find that the trial court did not abuse its discretion in admitting contested photographs that showed the location and nature of the victims' wounds.[32]

14. The trial court did not err by admitting contested photographs of the victims in life, and we further note that the trial court followed the recommended better practice of having someone other than a family member identify the photographs.[33]

### Sentencing Phase

15. The trial court qualified James Aiken as an expert on corrections and the classification of prisoners. Mr. Aiken testified that his evaluation of a prisoner's adaptability to prison life is often based in part on a review of the prisoner's family background. After Mr. Aiken had given some testimony about Lucas's family history, including an expression of his general impression of the nature of Lucas's background, the State objected on the ground that Mr. Aiken had begun testifying outside the area of his expertise. We find that the trial court erred by sustaining the objection on the ground raised, but we further find that the error was harmless beyond a reasonable doubt in light of the testimony actually given, which included generalizations about Lucas's background, some detail about his family history, and a clear expression of the witness's conclusions.

16. Lucas also contends that the State's cross-examination of Mr. Aiken was improper. Mr. Aiken had testified that Lucas could be safely confined and would not pose any future danger to the community. The district attorney cross-examined Mr. Aiken on his knowledge of Georgia prisons and the frequency of escapes from them. This subject matter was a proper subject for cross-examination, as the issue of prison security had been raised by the witness. However, we

---

[31] *Carter v. State*, 252 Ga. 502, 506 (6) (315 SE2d 646) (1984); *Hines v. State*, 249 Ga. 257, 258-259 (1) (290 SE2d 911) (1982).

[32] *Woods v. State*, 265 Ga. 685, 687 (3) (461 SE2d 535) (1995) (recognizing trial court's discretion in weighing the allegedly-improper prejudicial aspects of photographs of victims against the photographs' probative value).

[33] *Wilson v. State*, 271 Ga. 811, 819 (14) (525 SE2d 339) (1999); *James v. State*, 270 Ga. 675, 677 (5) (513 SE2d 207) (1999).

find merit in the objection Lucas raised asserting that the district attorney had been unclear or had exaggerated in his use of the phrase "every day" in describing the frequency of escapes. Nevertheless, we find, considering the trial record, that the ensuing exchange between the witness and the district attorney rendered harmless any error in the trial court's not addressing the district attorney's use of hyperbole, particularly because the district attorney himself later clarified that he was using the phrase as an idiom and not literally. Likewise, we conclude that any error in the trial court's failure to sustain a later defense objection to the district attorney's "testifying" in his cross-examination questions was harmless in light of the questions and testimony viewed as a whole.

17. The jury found beyond a reasonable doubt that Lucas committed the murder of Bryan Moss while engaged in the murder of Kristin Moss, that he committed the murder of Kristin Moss while engaged in the murder of Steven Moss, and that he committed the murder of Steven Moss while engaged in the murder of Bryan Moss. These findings did not violate this Court's rule against mutually-supporting aggravating circumstances.[34]

18. The jury found beyond a reasonable doubt that the murder of Bryan Moss was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind.[35] The trial court's charge on this statutory aggravating circumstance was read directly from the appropriate pattern charge after being properly adjusted according to the evidence.[36] Despite Bryan Moss's obvious young age, Lucas committed an aggravated battery against him by inflicting a non-fatal gunshot wound to his arm and shoulder, led him into a back bedroom as his sister approached the house, held him alive as his sister asked where he was and was then murdered nearby, fatally shot him four more times, and finally obtained another weapon from his co-defendant's automobile and shot him again. These facts authorize the jury's finding of the OCGA § 17-10-30 (b) (7) statutory aggravating circumstance regarding Bryan Moss's murder and the imposition of the death penalty under Georgia law and under the Constitution of the United States.[37]

19. We find no merit in Lucas's contentions regarding the sentencing phase jury charges given in his trial.

(a) Although charging the jury during both the guilt/innocence phase and the sentencing phase regarding the credibility of wit-

---

[34] *Hightower v. State*, 259 Ga. 770, 772 (5) (386 SE2d 509) (1989).

[35] OCGA § 17-10-30 (b) (7).

[36] Suggested Pattern Jury Instructions, Vol. II, Criminal Charges, Part 4 (B), pp. 84-86 (1999); see *West v. State*, 252 Ga. 156, 158-160 (2), 161-162 (313 SE2d 67) (1984).

[37] Id.; compare *Godfrey v. Georgia*, 446 U. S. 420 (100 SC 1759, 64 LE2d 398) (1980).

nesses is the better practice, a failure to charge the jury a second time on that subject is not reversible error, as the jury would understand that the guilt/innocence phase charge would apply to both phases.[38]

(b) Lucas argues that the jury's sentencing verdict violated *Apprendi v. New Jersey*,[39] which held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." We reject Lucas's argument that *Apprendi* requires reversal of his death sentences for the following reasons: (1) the range of possible punishments available under Georgia law in Lucas's case was fixed by the jury's findings beyond a reasonable doubt that he was guilty of murder and the jury's subsequent findings beyond a reasonable doubt that statutory aggravating circumstances existed; and (2) none of the other findings the jury or individual jurors might have made in fixing Lucas's sentences for the murders affected the range of penalties available to the jury under law, and the jury, or individual jurors, were entitled to make such findings by whatever standard it, or they, might have seen fit to apply and to give them such weight as it, or they, felt just.

(c) The trial court was not required to charge the jury on a burden of proof applicable to non-statutory aggravating circumstances[40] or to charge the jury regarding what weight such evidence should be given.[41] Instead, the trial court properly charged the jury that it was authorized to impose life sentences for any reason or no reason.

(d) The trial court was not required to charge the jury that mitigating circumstances need not be found unanimously, because it charged the jury that it could impose a life sentence for any reason or no reason.[42]

(e) Upon our review of the record, we find that the trial court's charge to the jury on the OCGA § 17-10-30 (b) (2) and the OCGA § 17-10-30 (b) (7) statutory aggravating circumstances would not have misled the jury into believing that it was authorized to punish Lucas for anything other than his own culpability in the murders.[43]

20. A woman testified at the motion for new trial hearing that she was prevented by a bailiff from entering the courtroom during

---

[38] *Wilson*, 271 Ga. at 818 (9).

[39] *Apprendi v. New Jersey*, 530 U. S. 466, 490 (120 SC 2348, 147 LE2d 435) (2000).

[40] *Pace v. State*, 271 Ga. 829, 842 (31) (524 SE2d 490) (1999); *Wilson*, 271 Ga. at 818 (10); *Ross v. State*, 254 Ga. 22, 31 (5) (d) (326 SE2d 194) (1985).

[41] *Butts*, 273 Ga. at 770 (28).

[42] Id. at 770-771 (29); *Wilson*, 271 Ga. at 818 (11); *Sears*, 270 Ga. at 844 (7) (e) (i).

[43] *Palmer v. State*, 271 Ga. 234, 238 (6) (517 SE2d 502) (1999) (evaluating a challenged sentencing phase jury charge in light of the charge as a whole and concluding that jury would not have been misled).

the sentencing phase closing arguments. However, the woman further testified that there were numerous spectators in the courtroom at the time and that she entered the courtroom and informed defense counsel of the incident during the next break in the trial proceedings, which was before the jury's verdict was announced. Pretermitting whether any impropriety existed under the circumstances described, we conclude that Lucas has waived his right to complain about this issue by his failure to raise it at trial.[44]

## Constitutional Issues

21. Lucas argues that execution by electrocution is cruel and unusual punishment. This issue has been decided in his favor by this Court's recent decision[45] declaring execution by electrocution to be unconstitutional and directing that all future executions in Georgia be carried out by lethal injection in accordance with OCGA § 17-10-38, as amended.

22. Because Lucas presented no evidence in support of his claim that execution by lethal injection is cruel and unusual punishment, that claim must fail.[46]

## Sentence Review

23. Upon our review of the evidence adduced in both phases of Lucas's trial, we conclude that the evidence was sufficient to enable a rational trier of fact to find beyond a reasonable doubt the existence of the statutory aggravating circumstances supporting the death sentences in this case.[47]

24. The summary of evidence set forth above in Division 1 demonstrates the highly aggravated nature of Lucas's crimes. Although there was evidence of alleged intoxication and other allegedly-mitigating factors presented to the jury, we do not find the jury's reaction to the evidence viewed as a whole to have been excessive.[48] Because this Court's proportionality review "includes special consideration of the sentences received by co-defendants in the same crime," we note that Lucas's co-defendant, Rhode, also has been sentenced to death.[49]

We conclude, considering both the crimes and the defendant,

---

[44] *Brown v. State*, 261 Ga. 66, 72 (7) (b) (401 SE2d 492) (1991).

[45] *Dawson v. State*, supra.

[46] Id.

[47] See *Jackson v. Virginia*, 443 U. S. 307; OCGA § 17-10-35 (c) (2).

[48] See *Gissendaner*, 272 Ga. 716-717 (19) (a).

[49] *Allen v. State*, 253 Ga. 390, 395-396 (8) (321 SE2d 710) (1984); see *Rhode*, 274 Ga. 377.

that the death sentences imposed for the murders in this case were neither excessive nor disproportionate to the penalties imposed in similar cases in Georgia.[50] The cases appearing in the Appendix support this conclusion in that each demonstrates a jury's willingness to impose a death sentence where a defendant has committed more than one murder, whether in one transaction or over time.

25. Upon our review of the record, we conclude that the death sentences in this case were not imposed under the influence of passion, prejudice, or any other arbitrary factor.[51]

*Judgments affirmed. All the Justices concur, except Sears, P. J., who concurs in the judgment and in all Divisions except Division 8, and Carley, J., who concurs in the judgment and in all Divisions except Division 16.*

APPENDIX.

*Rhode v. State,* 274 Ga. 377 (552 SE2d 855) (2001); *Colwell v. State,* 273 Ga. 634 (544 SE2d 120) (2000); *Esposito v. State,* 273 Ga. 183 (538 SE2d 55) (2000); *Heidler v. State,* 273 Ga. 54 (537 SE2d 44) (2000); *Morrow v. State,* 272 Ga. 691 (532 SE2d 78) (2000); *Pace v. State,* 271 Ga. 829 (524 SE2d 490) (1999); *Gulley v. State,* 271 Ga. 337 (519 SE2d 655) (1999); *Palmer v. State,* 271 Ga. 234 (517 SE2d 502) (1999); *Cook v. State,* 270 Ga. 820 (514 SE2d 657) (1999); *Jenkins v. State,* 269 Ga. 282 (498 SE2d 502) (1998); *DeYoung v. State,* 268 Ga. 780 (493 SE2d 157) (1997); *Raulerson v. State,* 268 Ga. 623 (491 SE2d 791) (1997); *McMichen v. State,* 265 Ga. 598 (458 SE2d 833) (1995); *Stripling v. State,* 261 Ga. 1 (401 SE2d 500) (1991); *Isaacs v. State,* 259 Ga. 717 (386 SE2d 316) (1989); *Moon v. State,* 258 Ga. 748 (375 SE2d 442) (1988); *Ford v. State,* 257 Ga. 461 (360 SE2d 258) (1987); *Childs v. State,* 257 Ga. 243 (357 SE2d 48) (1987); *Romine v. State,* 256 Ga. 521 (350 SE2d 446) (1986); *Cargill v. State,* 255 Ga. 616 (340 SE2d 891) (1986); *Blanks v. State,* 254 Ga. 420 (330 SE2d 575) (1985); *Putman v. State,* 251 Ga. 605 (308 SE2d 145) (1983); *Wilson v. State,* 250 Ga. 630 (300 SE2d 640) (1983); *Rivers v. State,* 250 Ga. 303 (298 SE2d 1) (1982); *Rivers v. State,* 250 Ga. 288 (298 SE2d 10) (1982); *Waters v. State,* 248 Ga. 355 (283 SE2d 238) (1981).

DECIDED NOVEMBER 19, 2001 —<br>RECONSIDERATION DENIED DECEMBER 14, 2001.

*Adams, Jordan & Treadwell, Donald J. Jordan, Brian G. Combs, Patrick Keenan,* for appellant.

---

[50] OCGA § 17-10-35 (c) (3).
[51] OCGA § 17-10-35 (c) (1).

*Fredric D. Bright, District Attorney, Thurbert E. Baker, Attorney General, Karen A. Johnson, Assistant Attorney General,* for appellee.