S06P0992. WALKER v. THE STATE.
(635 SE2d 740)

SEARS, Chief Justice.

A jury convicted Gregory L. Walker of malice murder, possession of a firearm during the commission of a crime, and possession of a firearm by a convicted felon. The jury recommended a death sentence for the murder conviction based on the following statutory aggravating circumstances: the murder was committed while the defendant was engaged in an aggravated battery; the murder was committed while the defendant was engaged in a kidnapping with bodily injury; and the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture and an aggravated battery to the victim prior to the victim's death.[1] The trial court denied Walker's motion for new trial, and he appeals.[2] Finding no reversible error, we affirm the convictions and sentences.

*General Grounds*

1. Walker contends that the verdict was contrary to the evidence, against the weight of the evidence, and contrary to law and principles of justice and equity, asserting that the only evidence against him was

---

[1] OCGA § 17-10-30 (b) (2), (7).

[2] The murder occurred on June 9, 2001. On December 13, 2001, a Camden County grand jury indicted Walker for malice murder, kidnapping, possession of a firearm during the commission of a crime, and possession of a firearm by a convicted felon. The State filed written notice of its intent to seek the death penalty on February 11, 2002. The charge of kidnapping was dismissed by order of nolle prosequi on February 3, 2004, and re-indicted in Glynn County, where venue was proper. Walker's trial began on January 24, 2005, and the jury convicted him on all remaining counts. The jury recommended a death sentence for the murder on January 28, 2005. In addition to the death sentence, the trial court imposed a consecutive five-year sentence for possession of a firearm during the commission of a crime and a concurrent five-year sentence for possession of a firearm by a convicted felon. Walker filed a motion for new trial on January 31, 2005, and amended it on November 29, 2005, and December 1, 2005. The trial court denied Walker's motion on December 19, 2005, and Walker filed a notice of appeal on January 13, 2006. This appeal was docketed on February 14, 2006, and orally argued on May 23, 2006.

circumstantial and corroborated by the impeached testimony of unreliable witnesses. "However, resolving evidentiary conflicts and inconsistencies, and assessing witness credibility, are the province of the factfinder, not this Court."[3] Moreover, "[t]his Court does not re-weigh evidence . . . [and] evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence."[4]

So viewed, the evidence in the guilt/innocence phase showed that on the morning of June 8, 2001, Walker, Shedrick Tate, and Denise Green were sleeping in a room in the Howard Johnson motel in Brunswick when the victim, Janeika Murphy, who was a motel housekeeper and an acquaintance of Walker's, entered the room and took money and a cigar box containing marijuana and cocaine. When Walker awoke and discovered the items were missing, he was furious and sent Green to the front desk to see if anyone had cleaned the room. He then searched the motel and angrily confronted Murphy about being in his room. Walker's girlfriend, Tomeka Perry, who was staying at Walker's home in Brunswick, testified that Walker called her about the missing drugs, saying he was going to find out who had them. Walker came home about 10:00 p.m. accompanied by Tate. After receiving a telephone call, Walker told Perry he knew who had his drugs, and he was going to get them. Then he and Tate took some clothes and left.

Green, who was from Jacksonville, Florida, and was unfamiliar with Murphy, testified that she drove Walker and Tate to get something to eat that night and that Walker stated that "he had to go check something out." The three drove around awhile, and Walker and Tate left the car at several stops before eventually getting out and walking up the street. About twenty minutes later, Walker called Green, giving her directions to meet them. When Green arrived, Walker directed her into the driveway of a house, where she saw Tate in the yard with a young woman. Tate was holding a handgun, and Walker ordered the woman into the car. After pushing her into the backseat, Walker and Tate sat on either side of her, and Walker directed Green to drive. In the rearview mirror, Green saw something "glossy," like mud, on the woman's forehead, and Green overheard Walker asking the woman how she could do this to him when he had helped her pay bills and buy items for her children. Walker eventually directed Green to stop at a secluded area so he could put the woman "somewhere safe." Walker, Tate, and the woman exited the car, and Green

---

[3] (Citations and punctuation omitted.) *Jones v. State*, 280 Ga. 205, 206 (1) (625 SE2d 1) (2005).

[4] (Citation omitted.) *Young v. State*, 280 Ga. 65, 66 (1) (623 SE2d 491) (2005).

drove around the block. When she returned, Walker and Tate got back into the car, but the woman was no longer with them and Walker had a gun, which he threw from a bridge on their return to Brunswick. Walker then directed Green to drive to a Wal-Mart to buy cleaning supplies. A Wal-Mart receipt for cleaning items purchased at 3:03 a.m. on June 9, 2001, was later found in Walker's room at Howard Johnson's. Green dropped Walker and Tate off at Walker's house, and she went to the carwash to clean blood from the car's backseat, as Walker instructed her to do.

Perry testified that, when Walker and Tate returned about 2:30 a.m., Walker told her he had killed the person who had his drugs, shooting her four times. Walker and Tate showered, put the clothes they had just removed in a black plastic bag, and left. Walker met Green at the carwash, and they returned to Howard Johnson's. When morning came, Green took a bus to Jacksonville, where she contacted her ex-husband, a police officer, who arranged for her to meet with law enforcement and cooperate with authorities.

Rodney Butler, the father of two of Murphy's daughters, testified that he went to Murphy's house around 2:30 a.m. on June 9, and, although Murphy's car was there, he found their infant and two-year-old daughters in the house alone in bed. Murphy never returned, and, shortly after 7:00 a.m., her body was found beside Refuge Road in Camden County. The medical examiner's testimony was that Murphy sustained three gunshot wounds to her head, any one of which would have been fatal. She also suffered painful blunt force injuries to the head, which were indicative of "pistol-whipping," and non-fatal gunshot wounds to both arms, including a painful bullet entry through her wrist, which were consistent with defensive injuries and probably inflicted while she was conscious. Several .40 caliber shell casings and projectiles were discovered near her body.

Harry Jackson testified that, while incarcerated with him, Walker told him he shot Murphy with a .40 caliber handgun about four times while she was lying on the ground trying to shield her head with her arms after Walker and Tate had beaten and dragged her from her home and Green had driven them to a secluded area. Walker offered Jackson $5,000 to retrieve from the woods the bag containing the clothes Walker and Tate had worn and then to destroy Walker's clothes, discharge a gun while wearing Tate's right shirt sleeve to leave gunpowder residue, and anonymously call the GBI, all in order to make it appear Tate was the gunman. Instead, Jackson went to the police, who found the bag of clothes in the location Walker had given Jackson. We find that the evidence was sufficient to authorize a

rational trier of fact to find beyond a reasonable doubt that Walker was guilty on all charges.[5]

## Constitutional Issues

2. Walker claims that the State failed to timely notify him of the statutory aggravating circumstances upon which it would rely to support his death sentence, contending that the United States Supreme Court's decision in *Apprendi v. New Jersey*[6] requires the State to allege the statutory aggravating circumstances in the indictment. However, as Walker acknowledges, this issue was decided adversely to his position in *Terrell v. State*.[7] There, this Court held that, in light of *Apprendi* and the more recent decision in *Ring v. Arizona*,[8] the defendant was provided "constitutionally sufficient notice of the State's intent to seek the death penalty and the statutory aggravating circumstances that it would rely on in seeking that sentence" when the State filed several months before trial a renewed notice of intent to seek the death penalty containing the statutory aggravating circumstances which would be used to support a sentence of death.[9]

Here, in compliance with Unified Appeal Procedure II (C) (1), Walker was notified prior to his first appearance hearing that the State intended to seek the death penalty, but, due to an acknowledged oversight by the State, the notice of the statutory aggravating circumstances upon which the State intended to rely was not filed until the first day of voir dire.[10] Pretermitting whether this rose to a constitutional violation,[11] we find it was harmless beyond a reasonable

---

[5] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See OCGA §§ 16-5-1; 16-11-106; 16-11-131.

[6] 530 U. S. 466 (120 SC 2348, 147 LE2d 435) (2000).

[7] *Terrell v. State*, 276 Ga. 34, 40-42 (5) (572 SE2d 595) (2002). See also *Lewis v. State*, 279 Ga. 756, 763 (9) (620 SE2d 778) (2005); *Riley v. State*, 278 Ga. 677, 680 (2) (604 SE2d 488) (2004).

[8] 536 U. S. 584 (122 SC 2428, 153 LE2d 556) (2002) (finding of aggravating circumstances necessary for imposition of death penalty are not mere sentencing factors but are matters to be determined by a jury beyond a reasonable doubt).

[9] *Terrell*, supra, 276 Ga. at 41-42.

[10] Given the fact that consideration of the presence or absence of statutory aggravating circumstances is determinative of the State's decision as to whether to seek the death penalty in the first place, the State should generally be able to give notice of the statutory aggravating circumstances upon which it intends to rely in its notice of intent to seek the death penalty, and we strongly urge district attorneys to do so at that time, or as soon thereafter as possible, to avoid oversights such as this one.

[11] See *Bowden v. Zant*, 244 Ga. 260, 263-264 (260 SE2d 465) (1979) (due process did not require that, prior to commencement of murder trial, State serve on defendant written notice as to which of the aggravating circumstances listed in statute State intended to try to prove). See also *Sears v. State*, 270 Ga. 834, 842-843 (6) (a) (514 SE2d 426) (1999) (defendant was timely notified of State's intent to seek to prove (b) (7) aggravating circumstance where notice was given while jury was deliberating in guilt/innocence phase, and, prior to trial, State had filed notice of intent to seek death penalty listing three (b) (2) aggravating circumstances and " 'any

doubt,[12] as one of the statutory aggravating circumstances relied upon by the State and which the jury found beyond a reasonable doubt — that the murder was committed while the defendant was engaged in a kidnapping with bodily injury — was alleged in the indictment, thus putting Walker on sufficient actual notice for due process purposes of that statutory aggravating circumstance.[13] Therefore, no reversal of Walker's death sentence is required, as his death sentence remains based upon at least one valid statutory aggravating circumstance.[14]

3. Trying the issues of guilt and sentence before the same jury in bifurcated proceedings was not unconstitutional.[15]

4. This Court's proportionality review "is neither unconstitutional nor inadequate under Georgia statutory law."[16]

5. The trial court did not err in rejecting Walker's claim that lethal injection is unconstitutional, as Walker proffered no evidence to sustain his claim.[17]

6. While Walker does not assert that the decision-makers in his case acted with any discriminatory purpose,[18] he contends that the prosecutor's authority to choose in which cases to seek the death penalty permits the possibility of an arbitrary and capricious abuse of discretion and is unconstitutional. This Court has held that prosecutors do not have unfettered discretion to seek the death penalty,[19] and it "has repeatedly rejected challenges to the legislature's determination that district attorneys should have the discretion to decide whether a murder defendant meets the statutory criteria for the death penalty and whether to pursue the death penalty when a defendant is eligible."[20]

7. Walker has abandoned the claim raised solely in his enumeration of error that the phrases "outrageously or wantonly vile, horrible or inhuman" and "depravity of mind" in OCGA § 17-10-30 (b) (7) are

---

others which may be supported by the evidence upon the trial of said case' "); *Roberts v. State*, 252 Ga. 227, 240 (11) (314 SE2d 83) (1984) (State not required to provide written notice of which statutory aggravating circumstances State intended to rely upon prior to trial).

[12] *Chapman v. California*, 386 U. S. 18 (87 SC 824, 17 LE2d 705) (1967).

[13] See *Goodwin v. Hopper*, 243 Ga. 193, 195-196 (4) (253 SE2d 156) (1979) (where appellant was indicted for both murder and armed robbery, he had actual notice of the aggravating circumstances used to impose the death penalty).

[14] *Jenkins v. State*, 269 Ga. 282, 294 (23) (a) (498 SE2d 502) (1998); *Wilson v. State*, 250 Ga. 630, 638 (9) (300 SE2d 640) (1983).

[15] *Frazier v. State*, 257 Ga. 690, 692 (4) (362 SE2d 351) (1987) (citing *Lockhart v. McCree*, 476 U. S. 162 (106 SC 1758, 90 LE2d 137) (1986)).

[16] *Gissendaner v. State*, 272 Ga. 704, 716 (16) (532 SE2d 677) (2000).

[17] See *Lucas v. State*, 274 Ga. 640, 651 (22) (555 SE2d 440) (2001).

[18] See *Rower v. State*, 264 Ga. 323, 323 (1) (443 SE2d 839) (1994).

[19] *Terrell*, supra, 276 Ga. at 44 (8).

[20] (Citations omitted.) Id. at 42 (5).

facially unconstitutional, because he has completely failed to support that claim with any argument or citation of authority in his brief.[21] Furthermore, this contention is without merit, as the United States Supreme Court and this Court have both rejected a facial challenge to the constitutionality of this statutory aggravating circumstance.[22]

8. Qualifying prospective jurors based upon their death penalty views does not deny capital defendants their right to an impartial jury drawn from a representative cross-section of the community and is not otherwise unconstitutional.[23]

## Jury Selection Issues

9. Walker contends that the trial court erroneously excused nine prospective jurors for cause based upon their purported opposition to the imposition of the death penalty. "The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment 'is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' "[24] On appeal, this Court must consider the voir dire of a disqualified prospective juror as a whole,[25] according deference to the trial court's "resolution of any equivocations or conflicts in the prospective juror's responses on voir dire."[26]

(a) *Prospective jurors Dutton and Rodgers.* In urging that it was error to strike these two prospective jurors, Walker relies only upon selected portions of their voir dire. A review of the record shows that, while prospective juror Dutton initially indicated that he was open to considering the death penalty as a sentencing option, almost immediately into voir dire he vacillated and repeatedly stated that he did not know whether he could vote for the death penalty. Finally, after extensive questioning by the trial court, he stated that the death penalty was against his nature and indicated that he did not think he could vote for it, regardless of the circumstances. In finding Dutton unqualified, the trial court relied in large part on Dutton's demeanor,

---

[21] Supreme Court Rule 22.

[22] *Gregg v. Georgia*, 428 U. S. 153, 201 (96 SC 2909, 49 LE2d 859) (1976); *Harris v. State*, 237 Ga. 718, 731-733 (III) (230 SE2d 1) (1976). See also *Godfrey v. Georgia*, 446 U. S. 420 (100 SC 1759, 64 LE2d 398) (1980).

[23] *Wainwright v. Witt*, 469 U. S. 412, 418-426 (II) (105 SC 844, 83 LE2d 841) (1985); *Gissendaner*, supra, 272 Ga. at 716 (17); *DeYoung v. State*, 268 Ga. 780, 790 (11) (493 SE2d 157) (1997).

[24] *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997) (quoting *Witt*, supra, 469 U. S. 424 at (II)).

[25] *Crowe v. State*, 265 Ga. 582, 588 (9) (a) (458 SE2d 799) (1995).

[26] *Lewis*, supra, 279 Ga. at 760 (3) (a).

noting his "body language" and the fact that, although he had indicated a couple of times that he might consider the death penalty, he "seemed to struggle with it." Deferring to the trial court's finding in this regard,[27] and, after reviewing his voir dire as a whole, we find no abuse of discretion in the trial court's disqualification of Dutton.

A review of prospective juror Rodgers' entire voir dire similarly reveals that he initially indicated, although somewhat hesitantly, that under some circumstances he could perhaps seriously consider voting for a death sentence. However, Rodgers went on to state that he believed his reservations about the death penalty would interfere with his ability to realistically consider it as a punishment option, and he later indicated that, no matter what the circumstances, he would always choose either life without parole or life with the possibility of parole, but never death. We conclude that, from the entirety of his voir dire, the trial court was authorized to find Rodgers was unqualified.[28]

(b) *Prospective jurors Brashier, Aldridge, Geter, Alderman, and Porter.* Even though prospective juror Brashier denied being conscientiously opposed to the death penalty, she stated that she did not "think that it's [her] right to make that decision for someone's life." She indicated that she would automatically vote against imposing the death penalty in any case, regardless of the circumstances, and that, even if she felt the State had proven guilt and at least one statutory aggravating circumstance beyond a reasonable doubt, and even if she had weighed the mitigating evidence and still felt the death penalty was the appropriate sentence, she could not vote to impose a death sentence. Prospective juror Aldridge indicated he could not personally consider the death penalty as a sentencing option under any circumstances. Prospective juror Geter stated that she was conscientiously opposed to the death penalty and indicated that there was no way she could consider those factors that might warrant the death penalty. Prospective juror Alderman stated that she was conscientiously opposed to the death penalty and indicated that she could not consider the death penalty as a sentencing option under any circumstances. Prospective juror Porter was adamant she could not consider the death penalty under any circumstances. The trial court was authorized to find that these jurors' views would

---

[27] *Waldrip v. State*, 267 Ga. 739, 744-745 (8) (c) (482 SE2d 299) (1997) (great deference accorded trial court's finding regarding prospective juror's demeanor).

[28] See *Riley*, supra, 278 Ga. at 685; *Braley v. State*, 276 Ga. 47, 50-51 (11) (572 SE2d 583) (2002); *Greene*, supra, 268 Ga. at 50.

prevent or substantially impair the performance of their duties in accordance with their instructions and oaths; accordingly, they were properly disqualified.[29]

(c) *Prospective jurors Lett and Rowell.* Prospective jurors Lett and Rowell both explicitly stated that they would not consider life in prison without parole, regardless of the circumstances. The trial court properly excused them for cause, as the court was authorized to find that both prospective jurors gave the impression they would be unable to apply the law faithfully and impartially.[30]

### Guilt/innocence Phase

10. The trial court, without objection from the State, conducted separate guilt/innocence proceedings on the charge of possession of a firearm by a convicted felon after the jury returned guilty verdicts on the charges of malice murder and possession of a firearm during the commission of a crime.[31]

(a) Walker contends he was entitled to a new jury on the trial of the possession of a firearm by a convicted felon charge. Generally, all charges arising out the same conduct must be tried in a single prosecution.[32] Although we have created a limited exception to this rule allowing, under proper circumstances, the bifurcation of a possession of a firearm by a convicted felon charge,[33] we have never held and we see no reason now to hold that a defendant is entitled to a separate trial before a new jury on that charge.[34]

(b) Walker also submits that conducting the trial on the possession of a firearm charge prior to the sentencing phase and before the same jury that imposed his death sentence unnecessarily prejudiced the jury by impermissibly placing his character in issue in the

---

[29] *Witt,* supra, 469 U. S. at 424 (II).

[30] *Greene,* supra, 268 Ga. at 50. See also *Lucas,* supra, 274 Ga. at 645-646 (9) (trial court did not abuse its discretion in making its findings regarding the jurors' abilities to consider all of the three sentences authorized under Georgia law).

[31] See *Head v. State,* 253 Ga. 429, 431-432 (3) (322 SE2d 228) (1984), overruled in part on other grounds, *Ross v. State,* 279 Ga. 365, 368 (2), n. 17 (614 SE2d 31) (2005) (if charge of possession of firearm by convicted felon is unrelated to another count for which defendant is to be tried, trial court, on motion, shall place defendant on trial for both charges but shall bifurcate proceedings; in cases in which possession count might be material to a more serious charge, trial need not be bifurcated).

[32] OCGA § 16-1-7 (b), (c); *Jarrell v. State,* 234 Ga. 410, 412 (1) (216 SE2d 258) (1975).

[33] See *Head,* supra, 253 Ga. at 431-432 (3). See also *Grimes v. State,* 280 Ga. 363, 365-366 (4) (628 SE2d 580) (2006); *Sealey v. State,* 277 Ga. 617, 620-621 (11) (593 SE2d 335) (2004).

[34] See *Cauley v. State,* 260 Ga. 324, 324-325 (1) (393 SE2d 246) (1990) (where indictment alleged that defendant murdered victim by shooting him with handgun, it was not error for trial court to deny defendant's motion to sever possession of a firearm by a convicted felon charge and try before a new jury).

sentencing phase. However, because the State could have introduced evidence of Walker's prior convictions during the sentencing phase,[35] it was not error to conduct the trial on the firearm possession at the end of the guilt/innocence phase.

(c) Walker further urges that the evidence was insufficient to convict him of the possession of a firearm by a convicted felon charge because the only evidence presented during the separate guilt/innocence phase on that charge was the certified copy of Walker's indictment, guilty plea, and sentence for the felony offense of theft by taking. However, the trial court properly instructed the jury that it was authorized to consider the evidence presented in the first guilt/innocence phase of the trial, as well as the evidence presented in the second guilt/innocence phase, in reaching its verdict regarding the charge of possession of a firearm by a convicted felon.[36] The evidence at trial on the other two charges was sufficient for the jury to find Walker guilty of malice murder and possession of a firearm during the commission of a crime. See Division 1, supra. With this evidence having been incorporated by reference into the trial on the firearm count, the jury was authorized to find that Walker possessed a firearm.[37] Evidence of Walker's prior conviction of a felony provided the additional element necessary for conviction.[38]

## Sentencing Phase

11. Walker contends that the trial court erred in the sentencing phase by charging, "[y]our verdict as to penalty must be unanimous," and further erred by subsequently directing the jury to continue its deliberations after the jury informed the trial court that they could not reach a unanimous verdict.

Walker's contention that the challenged charge is a misstatement of the law is without merit. Under Georgia law, the jury is expected to consider the evidence and attempt to reach unanimity " 'one way or the other' " on the issue of sentence and, if possible, to unanimously recommend a sentence; therefore, this Court has held that such an instruction is proper.[39]

---

[35] OCGA § 17-10-2 (a) (1), (c); *Braley v. State*, 276 Ga. 47, 54 (34) (572 SE2d 583) (2002).

[36] See *Evans v. State*, 240 Ga. App. 215, 217 (3) (522 SE2d 506) (1999) (jury authorized by law to consider evidence from the first phase of trial during its deliberations on the charge of possession of a firearm by a felon).

[37] *Holcomb v. State*, 213 Ga. App. 15, 16 (1) (443 SE2d 662) (1994).

[38] Id.

[39] OCGA §§ 17-10-2 (c) and 17-10-30 (c); *Romine v. State*, 256 Ga. 521, 525 (1) (b) (350 SE2d 446) (1986); *Potts v. State*, 261 Ga. 716, 724 (17) (410 SE2d 89) (1991); *Beasley v. State*, 269 Ga. 620, 623 (7) (502 SE2d 235) (1998).

After deliberating for less than two and a half hours, the jury sent a note to the trial judge stating it had been unable to reach a unanimous decision regarding the verdict as to sentence and asking for further instructions. Over Walker's objection, the trial court responded by sending a note back telling the jury to continue their deliberations. We find no abuse of the trial court's discretion by ordering the jury to continue its deliberations.[40]

12. Although the State obtained an order of nolle prosequi regarding the kidnapping with bodily injury charge before trial, the offense was sufficiently part of the same criminal transaction to permit the jury to find the statutory aggravating circumstance that the murder was committed while Walker was engaged in the commission of kidnapping with bodily injury.[41]

### Sentence Review

13. The death sentence in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor.[42]

14. Viewed in the light most favorable to the State, the evidence was clearly sufficient to authorize the jury to find the statutory aggravating circumstances beyond a reasonable doubt.[43] See Division 1, supra.

15. Walker's contention that his death sentence is impermissibly disproportionate to the sentences of his co-indictees is without merit. Co-indictee Green pled guilty to kidnapping and was sentenced to twenty years, with ten years to serve without the possibility of parole. Green testified that she thought they were going to get something to eat when she began as driver the evening the murder took place and that she continued to obey Walker out of fear of what Walker would do to her and her family. Green did not participate in finding out where Murphy lived, in forcing Murphy into the car, in removing her from the car, or in shooting her, nor was she present when Murphy was shot. This is borne out by Jackson's testimony of events as Walker told him they occurred; moreover, Walker told Jackson that Green was "just the driver of the vehicle." The evidence clearly showed that Walker and Tate were the moving forces behind Murphy's murder,

---

[40] See *Romine*, supra, 256 Ga. at 525-526 (1) (c).

[41] OCGA § 17-10-30 (b) (2); see *Lee v. State*, 270 Ga. 798, 803 (8) (514 SE2d 1) (1999) (holding that offense of kidnapping with bodily injury was sufficiently part of same criminal transaction to be considered as, and found to be, a (b) (2) aggravating circumstance of murder even though trial court directed a verdict of acquittal of kidnapping with bodily injury based upon improper venue).

[42] OCGA § 17-10-35 (c) (1).

[43] *Jackson*, supra, 443 U. S. at 307; OCGA § 17-10-35 (c) (2).

and, unlike Green who cooperated with authorities and confessed her part in the crimes, Walker devised a plan to tamper with and destroy evidence and to place all the guilt on Tate. Furthermore, the fact that Tate has yet to face trial and the possibility that he may not receive the death sentence do not make Walker's sentence disproportionate. "That different juries hearing different evidence might arrive at different punishment does not establish a claim of disproportionality."[44] Moreover, it is not the rule that one co-defendant may not be sentenced to death because another co-defendant receives a lesser penalty; each case must be decided on its own factual circumstances.[45]

The jury was authorized to find that Walker planned Murphy's abduction and murder based on his belief that Murphy had stolen his money and drugs. He sought out Murphy's residence, and he and Tate forced their way into Murphy's home in the middle of the night, pistol-whipped Murphy, dragged her from her residence leaving her two young children in the home alone, and transported her against her will to a secluded area in another county, where they together forced her out of the car and directed Green to drive away. Then Walker deliberately murdered Murphy by shooting her at least four times while she was trying to shield her head with her arms. Walker disposed of the murder weapon and directed Green to clean the blood from the car. Upon returning home, Walker removed his clothing, showered, put the clothing in a black plastic bag, and disposed of it in the woods. After he was arrested, Walker tried to pay Jackson to carry out a scheme to exonerate himself and place all the blame on Tate. The evidence was sufficient to find Walker was the prime mover in the planning and execution of Murphy's murder and then sought to conceal his part in it.[46]

The cases listed in the Appendix support the imposition of the death penalty in this case in that all involve a deliberate murder

---

[44] *Waldrip*, supra, 267 Ga. at 753 (25).

[45] *Carr v. State*, 267 Ga. 547, 559 (11) (480 SE2d 583) (1997).

[46] See *Gissendaner*, supra, 272 Ga. at 718-719 (19) (d) (death sentence imposed on defendant for malice murder of husband not disproportionate to sentence imposed on co-conspirator where defendant was moving force behind murder, stood primarily to gain financially from murder, and devised plan to suborn perjury and do violence against witnesses, unlike co-conspirator who confessed his guilt and cooperated with authorities); see also *Waldrip*, supra, 267 Ga. at 753 (25) (affirming death sentence where appellant was one among several persons likely to have been moving force, despite life sentence of co-indictees); compare *Hall v. State*, 241 Ga. 252, 259-260 (8) (244 SE2d 833) (1978) (death sentence imposed upon appellant for same crime in which co-defendant triggerman received life sentence was disproportionate where there was no evidence appellant ordered killing or was "prime mover" in crime).

during a kidnapping with bodily injury. Considering the crime and the defendant, we find that the sentence of death is not excessive or disproportionate.[47]

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Lewis v. State*, 279 Ga. 756 (620 SE2d 778) (2005); *Perkinson v. State*, 279 Ga. 232 (610 SE2d 533) (2005); *Sallie v. State*, 276 Ga. 506 (578 SE2d 444) (2003); *Braley v. State*, 276 Ga. 47 (572 SE2d 583) (2002); *Lucas v. State*, 274 Ga. 640 (555 SE2d 440) (2001); *Rhode v. State*, 274 Ga. 377 (552 SE2d 855) (2001); *Fults v. State*, 274 Ga. 82 (548 SE2d 315) (2001); *Esposito v. State*, 273 Ga. 183 (538 SE2d 55) (2000); *Gissendaner v. State*, 272 Ga. 704 (532 SE2d 677) (2000); *Gulley v. State*, 271 Ga. 337 (519 SE2d 655) (1999); *Lee v. State*, 270 Ga. 798 (514 SE2d 1) (1999); *Jenkins v. State*, 269 Ga. 282 (498 SE2d 502) (1998); *Waldrip v. State*, 267 Ga. 739 (482 SE2d 299) (1997); *Crowe v. State*, 265 Ga. 582 (458 SE2d 799) (1995); *Fugate v. State*, 263 Ga. 260 (431 SE2d 104) (1993).

DECIDED OCTOBER 2, 2006 —
RECONSIDERATION DENIED OCTOBER 30, 2006.

*Edward W. Clary, Richard O. Allen*, for appellant.

*Stephen D. Kelley, District Attorney, George C. Turner, Jr., Leslie K. DeVooght, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Elizabeth A. Burton, Assistant Attorney General*, for appellee.