[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-11909

_____

D.C. Docket No. 5:09-cv-00289-CAR

DANIEL ANTHONY LUCAS,

Petitioner - Appellant,

versus

WARDEN, GEORGIA DIAGNOSTIC AND CLASSIFICATION PRISON,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(November 12, 2014)

Before HULL, MARCUS, and WILLIAM PRYOR, Circuit Judges.

MARCUS, Circuit Judge:

Daniel Anthony Lucas was sentenced to death for his role in the murders of

three members of the Moss family during a botched burglary and robbery.  He

appeals the district court's denial of his federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Five claims are certified to us.  On none is he entitled to relief.

First, Lucas argues that his counsel were ineffective for failing to investigate and present evidence about the effect of intoxication on his memory when Lucas sought to suppress his videotaped confession.  Lucas has failed to establish prejudice under Strickland v. Washington, 466 U.S. 668 (1984), because the state court reasonably concluded that the additional expert testimony would not likely have led to the suppression of his confession.  Lucas also claims that counsel were ineffective for failing to present all of the available evidence concerning his social history as mitigation.  A reasonable state court, however, could have rejected this argument on performance or prejudice grounds.  In fact, trial counsel presented extensive evidence of the petitioner's troubled background as mitigation at the penalty phase and decided strategically to keep out certain evidence that would have also yielded aggravating facts.

Next, Lucas says that the State violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose a report of an interview of an eyewitness who briefly saw an intoxicated Lucas immediately after the killings.  The state court found the claim to be procedurally defaulted because the petitioner could not establish prejudice.  Like the district court, we agree, particularly in light of the substantial

2

body of evidence of intoxication actually presented to the jury.  Lucas cannot show prejudice because there is no reasonable probability that the witness's testimony would have affected the outcome.  Lucas also argues that he was deprived of a fair trial when a prosecutor said during cross-examination of a defense expert that prison escapes occurred "every day."  The Georgia Supreme Court's determination that the comments (improper though they may have been) were harmless in context was not contrary to or an unreasonable application of clearly established Supreme Court law.

Finally, Lucas claims that the jury was improperly limited in its consideration of mitigating evidence because the trial court refused to instruct the jurors that each mitigating factor need not be found unanimously.  Like the district court, we agree that the Georgia Supreme Court's decision was neither contrary to nor an unreasonable application of federal law clearly established by the Supreme Court when it determined that no such instruction was required because the jurors were expressly told they could impose life imprisonment "for any reason . . . or without any reason."  Thus, we affirm.

## I.

### A.

The essential facts adduced at trial are these.  See Lucas v. State, 555 S.E.2d 440, 443-44 (Ga. 2001).  On April 23, 1998, Lucas and Brandon Joseph Rhode

3

twice burglarized the home of Steven and Gerri Ann Moss. During their second burglary, eleven-year-old Bryan Moss returned home from school. When Lucas and Rhode saw Bryan, they confronted him and forced him to sit in a chair. Without warning, Lucas shot Bryan with a .25 caliber handgun causing non-fatal injuries to his upper arm and shoulder. Lucas led the wounded boy to a bedroom, where he shot Bryan repeatedly with the .25 caliber handgun. Meanwhile, fifteen-year-old Kristin Moss (Bryan's sister) also arrived home from school. Rhode placed her in a chair and shot her twice with a .357 caliber handgun. When the children's father, Steven Moss, came home shortly after, Rhode shot him too, four times with the .357 caliber handgun. Upon discovering what Rhode had done, Lucas retrieved a .22 caliber handgun from Rhode's car and still again shot both children, Bryan and Kristin Moss. The three members of the Moss family died from the gunshot wounds.

Several eyewitnesses saw Lucas and Rhode flee in Rhode's red car from the Mosses' home. One witness identified Lucas as the passenger. Rhode's car was linked to the scene by damage to the vehicle, a tire impression, and paint left at the scene. Lucas admitted his role in the killings in a videotaped confession.

B.

On September 16, 1999, a jury in Jones County, Georgia, convicted Lucas of three counts of malice murder, three counts of felony murder, two counts of

4

burglary, and one count of kidnapping with bodily injury.[1]  The next day, following the sentencing phase, the jury found beyond a reasonable doubt that the murder of Bryan was committed while Lucas was engaged in the murder of Kristin, a burglary, and a kidnapping with bodily injury, O.C.G.A. § 17-10-30(b)(2), and that it was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind, id. § 17-10-30(b)(7).  The jury also found beyond a reasonable doubt that Kristin's murder was committed while Lucas was engaged in the murder of Steven and a burglary.  Id. § 17-10-30(b)(2).  Finally, the jury concluded beyond a reasonable doubt that the murder of Steven was committed while Lucas was engaged in the murder of Bryan and a burglary.  Id.  The jury unanimously concluded that the petitioner should be sentenced to die for each of the three murders.  See id. § 17-10-31(a).[2]

Lucas appealed without success his conviction and sentence to the Georgia Supreme Court.  Lucas, 555 S.E.2d at 443.  The Supreme Court denied a writ of certiorari.  Lucas v. Georgia, 537 U.S. 840 (2002).  Lucas then filed a pro se petition for a writ of habeas corpus in a state trial court on August 13, 2003, followed by an amended petition on March 1, 2007.  The state habeas court denied

---

[1] Because Jones was convicted of the three counts of malice murder, the three corresponding felony murder convictions were vacated because they merged with malice murder.  Lucas, 555 S.E.2d at 443 n.1; see O.C.G.A. § 16-1-7.

[2] Separately, Rhode was tried, convicted, sentenced to death, and executed by the State of Georgia.

Lucas's petition.  Thereafter, the Georgia Supreme Court denied Lucas's application for a certificate of probable cause to appeal.  Again, the Supreme Court denied certiorari review.  Lucas v. Upton, 559 U.S. 979 (2010).

Lucas then filed his extensive habeas claims in the United States District Court for the Middle District of Georgia.  The district court determined that three of the eleven claims, including his Brady claim that the prosecution withheld exculpatory evidence, were procedurally defaulted because he had not timely raised them in the state courts and he could not excuse the default.  The court denied the remaining claims, including his arguments: that counsel had been ineffective in failing to adequately investigate and challenge the videotaped confession and in failing to present available mitigation evidence; that due process was violated by the prosecutor's cross-examination questions asserting that Georgia prison escapes happened "every day"; and that the penalty-phase jury charge and instructions unconstitutionally suggested that mitigation circumstances must be found unanimously.  The district court granted Lucas a certificate of appealability on his two ineffectiveness of counsel claims and his Brady claim.  On Lucas's motion, we expanded the COA to include the claims challenging the prosecutor's questions and the jury instructions.

## II.

We review de novo a district court's denial of federal habeas relief.  Peterka

6

v. McNeil, 532 F.3d 1199, 1200 (11th Cir. 2008).  No one disputes that the

Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to Lucas's

habeas petition.  Under AEDPA, if a petitioner's habeas claim "was adjudicated on

the merits in State court proceedings," a federal court may not grant relief unless

the state decision (1) "was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United

States," or (2) "was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Under

§ 2254(d)(1)'s "contrary to" clause, we grant relief only "if the state court arrives

at a conclusion opposite to that reached by [the Supreme] Court on a question of

law or if the state court decides a case differently than [the Supreme Court] has on

a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 413

(2000).  Under § 2254(d)(1)'s "unreasonable application" clause, we grant relief

only "if the state court identifies the correct governing legal principle from [the

Supreme] Court's decisions but unreasonably applies that principle to the facts of

the prisoner's case."  Id.  For § 2254(d)(1), clearly established federal law includes

only the holdings of Supreme Court decisions -- not Supreme Court dicta and not

the opinions of this Court.  White v. Woodall, 134 S. Ct. 1697, 1702 (2014).

     The Supreme Court has explained that, to satisfy § 2254(d), "a state prisoner

must show that the state court's ruling on the claim being presented in federal court

was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011). The state court need not cite or even be aware of Supreme Court precedents "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002). "[A]n 'unreasonable application' of [Supreme Court] holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." Woodall, 134 S. Ct. at 1702 (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)). In other words, Lucas must establish that no fairminded jurist would have reached the Georgia court's conclusion. See Richter, 131 S. Ct. at 786-87. And Lucas must do so based only on the "record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011). AEDPA also requires that we give state court factual findings great deference. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "If [the AEDPA] standard is difficult to meet, that is because it was meant to be." Richter, 131 S. Ct. at 786.

On federal habeas review, a federal constitutional error is harmless unless there is "actual prejudice," meaning that the error had a "substantial and injurious

8

effect or influence" on the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Harmlessness under the Brecht standard is a question of law that we review de novo. Vining v. Sec'y, Dep't of Corr., 610 F.3d 568, 571 (11th Cir.2010) (per curiam); Prevatte v. French, 547 F.3d 1300, 1305 (11th Cir.2008). "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman [v. California, 386 U.S. 18 (1967)]." Fry v. Pliler, 551 U.S. 112, 120 (2007).  Because of the "[s]tates' interest in finality," the states' "sovereignty over criminal matters," and the limitation of habeas relief to those "grievously wronged," the Supreme Court set out in Brecht a standard that is more favorable to and "less onerous" on the state, and thus less favorable to the defendant, than the usual harmless beyond a reasonable doubt standard.  Brecht, 507 U.S. at 637; accord Fry, 551 U.S. at 117. The Supreme Court explained in Brecht that "collateral review is different from direct review," and, therefore, that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment."  507 U.S. at 633–34.  Thus, "a federal habeas court may deny relief based solely on a determination that a federal

9

constitutional error was harmless under the Brecht standard." Mansfield v. Sec'y, Dep't of Corr., 679 F.3d 1301, 1308 (11th Cir. 2012), cert. denied sub nom. Mansfield v. Tucker, 133 S. Ct. 861 (2013) (emphasis added).

III.

Lucas first claims that trial counsel were ineffective in two distinct ways: first, because they inadequately attempted to suppress his videotaped confession; and, second, because they failed to make a fulsome-enough presentation of the available mitigating evidence during the penalty phase. It is by now hornbook law that Strickland v. Washington, 466 U.S. 668 (1984), requires that Lucas establish both "that his counsel provided deficient assistance and that there was prejudice as a result." Richter, 131 S. Ct. at 787. "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" Id. (quoting Strickland, 466 U.S. at 688). Moreover, prejudice demands "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Richter, 131 S. Ct. at 792. "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Id. at 788 (citations

10

omitted).

"[T]he highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision" for our AEDPA review. Newland v. Hall, 527 F.3d 1162, 1199 (11th Cir. 2008). Lucas first raised his Strickland claims before the state habeas court, which rejected them on the merits. The Georgia Supreme Court refused to issue a certificate of probable cause to appeal the state habeas court's decision. Under our precedent, the Georgia Supreme Court's denial of the application for a certificate of probable cause to appeal was the final state-court determination of Lucas's Strickland claims. See Jones v. GDCP Warden, 753 F.3d 1171, 1182 (11th Cir. 2014) ("[T]he rejection of petitioner's application for a certificate of probable cause to appeal was, implicitly, a determination that none of petitioner's claims had arguable merit.") (internal quotation marks omitted). Though the Georgia Supreme Court did not offer reasons for its decision, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S. Ct. at 784. Lucas cannot meet his substantial burden here because the Georgia Supreme Court had many reasonable grounds for denying the Strickland claims. Indeed, the outcome would not have been different even if the state trial court's habeas ruling was the relevant decision because that court did not act contrary to nor

11

unreasonably apply clearly established Supreme Court law either.

## A.

Lucas first says that trial counsel were ineffective for failing to adequately develop and present expert witness testimony concerning the claimed involuntariness of Lucas's confession. The essential facts are these. On April 25, 1998, two days after the murders, police questioned Rhode, who told them he was with Lucas on the day of the crime. That night, officers questioned Lucas at the Jones County Sheriff's Department. Lucas signed a waiver of his Miranda rights and first denied any involvement in the slayings. During a break after about an hour, the officers learned Rhode had implicated his confederate, Lucas, in the murders. When confronted with this fact, Lucas continued to deny shooting anyone or even possessing a gun that night. After still another break, the officers showed Lucas three firearms used in the crime that had been recovered with Rhode's help. One officer told Lucas that Rhode was "going to be the main witness against" him and "end up putting [him] in the electric chair" if Lucas didn't tell his side of the story. Lucas said he did not know what to do and asked to see his girlfriend. The two interrogating officers left the room and allowed him to speak with her for about five minutes. When the officers returned around midnight, Lucas told them he wanted to sleep. He was escorted to a cell for the night.

12

The next morning, April 26, an officer retrieved Lucas and offered him food, drink, and a cigarette. Lucas again was read his Miranda rights and said he was willing to answer questions. One of the officers told Lucas that Rhode had given a videotaped confession, which Lucas asked to see. After watching the tape, Lucas said it was "bull shit" and agreed to tell his side of the story. An officer still again read Lucas his Miranda rights. Lucas said he understood his rights and had not been offered anything or threatened to elicit his statement. Lucas then gave a videotaped confession to the Jones County police around noon.

Lucas began by explaining that he took six Xanax pills before burglarizing the Moss home. He explained that, shortly after he and Rhode broke into the home the second time, eleven-year-old Bryan Moss arrived. Lucas walked into the living room, found the little boy sitting in a chair, and shot the boy, though he did not kill him. Lucas took the boy into a bedroom. Rhode then yelled to Lucas that a girl was coming in the house. Rhode then shot her. Lucas also recounted Rhode telling him that her father was coming into the home next. After the father hollered, Lucas said, "we shot him. I don't know -- I didn't hardly remember hearing the gunshots or nothing." According to Lucas, "I went in the living room and the man was on the -- on the floor and the girl was sitting in the chair and I went back into the bedroom and the little boy was sitting there and I shot him." Lucas said he returned to the bedroom, shot Bryan again, and then walked out to

13

Rhode's car to get a .22 caliber handgun.  Lucas told police he came back inside and shot the girl, Kristin, who was sitting in a chair after already having been wounded by Rhode.  Lucas said he also might have shot the boy, Bryan, with the .22 caliber handgun.  Lucas admitted that he knew what he did was wrong and said he was sorry.  He offered no reason or explanation for what happened.

Lucas's trial counsel moved to suppress the confession as being involuntary and unreliable for at least five reasons, including because Lucas simply repeated what the officers and Rhode had told him since his drug and alcohol consumption kept him from having any memory of the events.  The trial court considered Lucas's motion to suppress at a pretrial hearing on July 9, 1999.  After reviewing the videotaped confession and hearing testimony from the interrogating officers, the trial court denied Lucas's motion to suppress.  On direct appeal the Georgia Supreme Court affirmed, finding the confession to have been voluntarily made after Lucas waived his Miranda rights.  Lucas, 555 S.E.2d at 445-46.

Lucas later argued to the habeas state trial court that trial counsel were ineffective because they failed to develop and present expert testimony from Dr. Anthony Stringer, a neuropsychologist, and Dr. Randall Tackett, a pharmacology expert, to support their claim that Lucas's intoxication on the day of the murders rendered his confession unreliable.  Dr. Stringer testified at an evidentiary hearing that he was hired by trial counsel in March 1999 to conduct a neuropsychological

14

examination of Lucas and to evaluate Lucas's "susceptibility to suggestion from others and his memory and behavior." Stringer testified about Lucas's "horrific family circumstances," his "extensive drug abuse," and "the fact that he had . . . a number of incidents where he had suffered blows to the head." Stringer said Lucas tested with an IQ of 110, at the upper end of the average range, but that he suffers from "left hemisphere brain dysfunction," which can be associated with "remember[ing] information in less detail." Stringer added that Lucas, due to this disorder, may have gaps in his memory and might "take information that someone has provided him . . . as being accurate." He said he reviewed Lucas's videotaped confession in 2002 and, had he seen it in 1999, he could have testified that the statement contained "gaps with regards to any detail" and "it seemed to be very much responsive to the information that was being presented to him." Stringer said he was not called to testify at the suppression hearing or Lucas's trial.

Dr. Tackett also testified at the state habeas evidentiary hearing. He said that trial counsel contacted him in September 1998 and asked him to assess the effects of drugs and alcohol on Lucas. Tackett explained that Lucas had a family and personal history of drug abuse, which included "everything from cocaine, alcohol, mushrooms, LSD, [and] prescription drugs." According to Tackett, Lucas could not remember much of what happened inside the Moss residence on the day of the murders. Tackett said he informed trial counsel that he "felt strongly that

15

[Lucas] had experienced a blackout or blackouts during the day of the crime." He also testified that Lucas, because of his blackouts, was susceptible to suggestibility, which meant that when Lucas could not recall a detail about the events of the day, he accepted an explanation suggested by someone else. Tackett opined that the combination of drugs and alcohol that Lucas consumed on the day of the murders "made it impossible for Mr. Lucas to understand events as they occurred, much less remember any details later."

On cross-examination, Tackett acknowledged, however, that he did not know the exact amount of substances Lucas consumed on the day of the murders. He also explained that it was not his opinion Lucas had no memory of the crimes, just that there were periods of time that Lucas could not recall. Tackett said he disagreed with Dr. John Robert Cusak, another of Lucas's experts, who found that Lucas was not in a blackout the day of the murders. Tackett explained that he informed trial counsel of these findings and opinions but they did not call him to testify at the suppression hearing or at trial.

The state habeas trial court denied relief on both the performance and prejudice prongs of Strickland. The court observed that Lucas "has never denied involvement in the case, and has never told anyone, in the past or present, that his confession is untrue." To the contrary, the state habeas trial court found that Lucas's statements to law enforcement and others showed he had a particularized

16

memory of the crimes and of shooting Bryan Moss.  Indeed, Lucas had "made statements to his Uncle Brad Lucas and Derrick Jackson prior to talking to police saying that he 'messed up real bad' and 'killed somebody,'" and told "Robbie Hunnicutt on the afternoon of the murders . . . that 'he was killing those motherfuckers.'"  The court concluded that, combined with the videotaped confession, the other confessions undermined Lucas's claim that police fed him information about the crime and also undermined his experts' opinions that Lucas was in a blackout and without any memory of the crimes.  The state habeas trial court found Lucas's story was not likely to have been suggested by Rhode because Lucas viewed Rhode's videotaped statement just before saying "that's bullshit" and specifically recounting events that contradicted some of Rhode's version.

We hold that the Georgia Supreme Court had a reasonable basis for rejecting Lucas's claim because the petitioner failed to establish a reasonable probability that the result would have been different had the additional testimony been offered at the suppression hearing.  The testimony that Lucas says should have been presented -- suggesting the petitioner had no memory of the events of the murder due to drug use or brain damage -- was directly refuted by a substantial body of evidence.  Lucas professed and exhibited a memory of the murders in his videotaped confession.  He claimed specific responsibility for shooting Bryan and Kristin, but not their father, whereas Rhode claimed that Lucas was responsible for

17

all three slayings. And, before talking with police, he confessed to his uncle, Jackson, and Hunnicutt about killing the victims. The long and the short of it is that the petitioner has failed to establish that the state court's determination about prejudice was contrary to or an unreasonable application of clearly established precedent. Since this claim fails on the prejudice prong we have no occasion to address performance. See Strickland, 466 U.S. at 697.

In a related Strickland argument, Lucas says that trial counsel also should have argued the police fed Lucas with the information contained in his confession because every verifiable fact in Lucas's statement could be traced to another source. In essence, Lucas observes that police knew most of the basic facts of the crime by the time Lucas confessed four days after the killings. No real surprise. The police had investigated the crime and talked extensively with Rhode, so they already were far along in gathering the facts that could be used to confirm Lucas's story. Moreover, Lucas ignores the key, unverifiable facts that he confessed about, including having shot two victims -- the brother and the sister -- not three. Thus, Lucas has failed to establish that the state court determination about performance was an unreasonable application of Strickland. Under our doubly deferential review, a court could reasonably conclude that trial counsel acted reasonably. Moreover, the Georgia Supreme Court had a reasonable basis for concluding that

18

petitioner failed to establish any prejudice.[3]

### B.

Lucas' next Strickland claim is that his trial counsel were ineffective for failing to fully present his life history as mitigation during the penalty phase. A review of the extensive record suggests quite the opposite. Indeed, the penalty phase revealed that petitioner's counsel presented substantial testimony concerning Lucas's personal background, family history, and character, among other things. We detail what was presented because it amply establishes that the Georgia Supreme Court did not unreasonably apply Strickland to that claim.

Lucas's counsel presented the testimony of Dr. Cusack, "an expert in Psychiatry with a special expertise in the effects of drugs and alcohol," who explained the effects of Xanax, Darvocet, and alcohol -- the drugs Lucas consumed on the day of the murders. Cusack specifically opined that Lucas's "recollection or reasoning, his impulsivity, everything was eroded, almost destroyed," and "his judgment . . . was significantly marred." Indeed, Cusack added that he did not think the murder would have occurred but for the substances Lucas took.

Trial counsel also called Kelly Bowden, Lucas's aunt, who testified in detail, averring that Lucas's maternal grandmother had always abused drugs and alcohol,

---

[3] For the same reasons, we are unpersuaded by Lucas's argument that trial counsel should have developed the suppression argument about no new, verifiable information in Lucas's statement by consulting with "an expert in coerced confessions."

so much so that her children were placed in foster care. Meanwhile, Lucas's maternal grandfather was in prison. Bowden also said that Lucas's mother began using drugs and alcohol at an early age. By eighteen, Debra was pregnant with Lucas. After Lucas's birth, his father and Debra drank alcohol excessively, smoked marijuana, used crack cocaine, and took methamphetamines for much of his childhood, often when Lucas was in the house. According to Bowden, substance abuse made it impossible for David and Debra to care for Lucas and his younger sister Lacey. Bowden said that, in addition to abusing drugs in the children's presence, Lucas's parents often fought in front of him and his sister. Despite these surroundings, Bowden said Lucas had been a sweet and loving child. She asked the jury not to impose the death penalty.

Defense counsel also called Lucas's sister Lacey, fourteen at the time of trial. She too testified about the harrowing circumstances surrounding the petitioner's childhood and upbringing. Lacey observed that her brother protected her when their parents fought and comforted her and covered her ears so she would not hear their mother and father argue. She said she loved her brother, she apologized for the murders, and asked the jury to spare Lucas's life.

Lucas's paternal grandmother, Fay Lucas, testified that Lucas's father had not been present one day at the trial. Fay said she spent a lot of time with Lucas when he was young and that he was more like a child to her than a grandchild. She

20

called him a "marvelous child" who was sweet and well-behaved. She said he was a gifted artist who still sent her pictures and wrote her often. Fay explained that she frequently visited Lucas in jail and knew he was remorseful. She pled with the jury to spare his life. Lucas's paternal grandfather, Charles Lucas, also testified that Lucas was a good child. He said he loved Lucas and sees him every week on visiting day. He begged the jury not to sentence him to death. Reverend John Miller Brown, the pastor at Debra's church, testified that he visited Lucas in jail about six times and that Lucas was "[v]ery remorseful and is feeling a lot of pain for what he's done."

Trial counsel also presented a series of witnesses to testify about Rhode's criminal history in order to establish that he, and not Lucas, was the leader of the criminal enterprise on the night of the murder. Thus, the jurors were presented with testimony from the defense that Rhode successfully escaped from the Jones County Jail and attempted a second escape in which a female jail supervisor was physically attacked. A Georgia Bureau of Investigation Special Agent testified that a polygraph of Rhode after the murders established deception when Rhode denied shooting the victims -- the strongest deception occurred when Rhode claimed he had not shot "the girl." Still another witness, Bryan Keith Hyde, Jr., testified that when he was fourteen Rhode talked him into burglarizing a home, something Hyde had never done before. According to Hyde, Rhode told him what

21

to steal in the home and took several firearms, including one Rhode kept to commit three more burglaries that day.

Trial counsel also cross-examined Derrick Jackson, a State witness, in order to establish that Rhode "had been involved in virtually dozens of burglaries" around the time of the murders, while Lucas had been involved in "no more than three." Jackson also testified that Lucas drank alcohol and used drugs, including marijuana, mushrooms, and angel dust, at a young age. Jackson stated that Lucas's family abused drugs and drank alcohol. Jackson told the jury that at the time of the murder Lucas had no home and nowhere to go. His "mother had kicked him out and his father just . . . never seemed to care. I mean, never." Jackson explained that Lucas often talked to him about feeling neglected and abandoned by his family. He told the jury that Lucas "always felt like -- he felt nobody wanted him."

Finally, as part of the elaborate mitigation presentation by defense counsel, James Evans Aiken, a former prison warden, was called to testify as a corrections and prison classifications expert. Aiken told the jury that he had reviewed Lucas's records from the Jones and Baldwin County jails and had spoken to jail staff, who described Lucas as someone who "stays out of trouble," "stays to himself," and "avoids trouble makers." Lucas had been a model prisoner "for an extended period of time" and, according to jail officials, "[i]f we had everybody like Mr. Lucas, we

22

wouldn't be running up and down these hallways all the time." Aiken opined that Lucas could be safely confined in a maximum security facility for the remainder of his life without harming staff, other inmates, or the community.

Aiken also testified that he spoke with Lucas's family to learn about the environment in which he grew up. Aiken noted that, though he had interviewed "many people," seen "many lives that ha[d] been destroyed due to family dysfunction," and had "heard some heartbreak stories," "[t]his case and this family history [would] always remain with [him] so long as [he] live[d]." He explained that Lucas's family had a history of substance abuse, sexual abuse, alcohol abuse, and abject poverty. Lucas's family "ha[d] no structure," "the mother is beaten up," and the "father is an alcoholic." Lucas grew up in a family setting where he didn't know what to expect coming home from school: "Is it going to be a boyfriend that's beating up the mother[?]" Aiken said, in Lucas's case, the problems had passed "from generation to generation." The State objected to further family background testimony from Aiken. The trial court sustained the objection, ruling that Aiken was going "outside the bounds of the qualification." Still, Aiken explained that the way Lucas dealt with his unstable upbringing was important from a corrections perspective. Aiken reported, "I didn't find any incidents of violence, no arrest record where he was violent in a domestic situation or in the community."

23

Notwithstanding the presentation of this mitigation evidence, Lucas claimed that counsel was ineffective for failing to put forward still more facts about his childhood.  Specifically, Lucas submitted an affidavit from Louis Pelt, who grew up with Lucas.  Pelt stated that he saw Lucas's father beat Lucas with a belt and that Lucas's stepmother Ginger often yelled at Lucas, called him obscene names, and belittled him.  Pelt said that "Ginger had strange sexual habits" and on multiple occasions had touched Pelt's genitalia when he was about fourteen.  Lucas also submitted an affidavit from Curtis Stephens, a high-school friend of Lucas's, who stated he avoided Lucas's house because of Ginger, "a 'pill-popper' who would often say sexual things to [Lucas]."  Stephens reported that Ginger would watch Lucas shower and comment on his genitals.  Lucas also points to material in defense counsel's files referencing verbal abuse from Ginger, physical violence Lucas's father inflicted on Lucas's mother and her boyfriend, and abuse Lucas's mother endured at the hands of boyfriends.

Lucas concedes, as he must, that trial counsel adequately investigated his background.  He argues only that trial counsel did not present all of the evidence it had discovered.  But "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690.  The state habeas court rejected Lucas's Strickland claim, concluding "that trial counsel's presentation of mitigation evidence and trial

24

counsel's arguments, which were based on strategic decisions after a thorough investigation, were not unreasonable and Petitioner was not prejudiced by trial counsel not submitting the additional mitigation evidence or arguments presented to this Court."  In the face of the elaborate record presented by the defense counsel in mitigation, we are hardpressed to conclude that the Georgia Supreme Court unreasonably applied Strickland when it denied Lucas's claim.  Trial counsel presented the jury with evidence of an extensive family and personal history of drug abuse.  The jurors learned that Lucas grew up amidst poverty, instability, neglect, addiction, and abuse.  The additional evidence identified by Lucas would have added little to the mitigation case because other evidence informed the jury of his sad social history.  See Pinholster, 131 S. Ct. at 1409 ("The 'new' evidence largely duplicated the mitigation evidence at trial.").

In addition, trial counsel reasonably feared that the additional evidence now identified by Lucas would be a "two-edged sword," undermining the argument that he had endured a tough life but was largely an "innocent" until people like Rhode influenced him.  Atkins v. Virginia, 536 U.S. 304, 321 (2002).  Indeed, when asked if Lucas was a leader among his peers, Pelt explained that "when I'd be around [Lucas would] be the oldest one, so . . . we all looked up to him."  This information would have collided with trial counsel's attempt to paint Rhodes as the "leader" in the triple murder.  What's more, Pelt and Stephens testified extensively about

25

Lucas's prior drug use. The Supreme Court has recognized that evidence of previous abuse and addiction can be mitigating in that it may offset moral culpability, but also that it can have aggravating aspects if it undermines capacity for rehabilitation and enhances future dangerousness. See Pinholster, 131 S. Ct. at 1410; Wong v. Belmontes, 558 U.S. 15, 22-24 (2009). Thus, while Pelt described some physical and sexual abuse of Lucas, he also recalled that, leading up to the Moss murders, Lucas "got more wild, just . . . not caring . . . . He used to dress real nice and all, . . . then you see him and . . . he'd be . . . barefooted and . . . drunk half the time or messed up . . . ." Pelt said that, during his teen years, "[t]he amount of drugs [Lucas] was doing was on a higher level than what everybody else was doing. He was doing a lot more. . . . Crank, cocaine, acid. I don't know, pretty much everything that's out there."

Stephens described strange sexual behavior of Lucas's stepmother, but also told how Lucas would take pills, including Xanax, from her house. Stephens said that Lucas got into using and selling "crank," or methamphetamine. In his affidavit, Stephens reported Lucas's monumental substance abuse, which "spiraled out of control" and included: "one gram of crank per day while drinking and popping pills at the same time"; hallucinogenic mushrooms, which he picked trashbags full of and "was constantly eating"; a "tremendous amount of acid," at times "four to seven hits of acid at a time, when everyone else around him was

26

taking one to two hits" -- sometimes he took as many as fourteen acid hits; on a number of occasions, using about an "eight ball" of crack cocaine over a two or three day period; and eventually, Lucas devolving to smoking embalming fluid. Stephens "seldom saw [Lucas] without an alcoholic beverage in his hand." Contrary to the nonviolent image of Lucas painted by trial counsel, Stephens notably also said Lucas got into many fistfights with his cousin, including one when they were at a restaurant that continued into a moving pickup truck and caused a car accident.

The testimony about Lucas's childhood from witnesses like Pelt and Stephens amounted to a mixed mitigation bag that arguably could have opened the door to damaging evidence and "would likely have been more harmful than helpful." Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1324 (11th Cir.), cert. denied sub nom. Evans v. Crews, 133 S. Ct. 2742 (2013). On this mixed record, a court reasonably could conclude that Lucas's lawyers followed a reasonable mitigation strategy, particularly because Pelt or Stephens could have damaged the sympathetic image of Lucas that counsel sought to cultivate. Moreover, the Georgia Supreme Court reasonably could have found no Strickland prejudice because the additional mitigation, viewed alongside the aggravating evidence that would have come with it, and the powerful aggravators already in the record, would not have affected the outcome with any reasonable probability.

27

The same is true for Lucas's claim that trial counsel "mishandled" Aiken by presenting him as a lay witness instead of as a mitigation expert opining about Lucas's background, although he was qualified as an expert in corrections and prison classifications. As this record reveals, Aiken offered social history testimony at trial touching on Lucas's experiences with poverty, drugs, alcohol, and abuse. Moreover, trial counsel explained at the state habeas hearing that they made the decision to present Mr. Aiken instead of a psychologist or psychiatrist as they believed that he would be their best witness in mitigation. As part of this strategy, trial counsel observed that they wanted to "cherry pick" positive mitigation evidence from Mr. Aiken so that it would fit with his purpose in testifying. By "cherry picking" their mitigation evidence from Mr. Aiken, trial counsel said they would have been able to elicit testimony regarding Lucas's social background that could not safely have been brought out through other witnesses without also confronting a variety of negative comments too. Thus, for example, aside from the potentially damaging evidence we've detailed about Lucas's serious substance abuse problem and his violent behavior, there was also evidence from Lucas's mother that he had been kicked out of her house three months prior to the murder because he had been using drugs, arguing, and fighting with her, and, indeed, he had even brought drugs into the home around his younger sister. His mother further acknowledged that immediately before Lucas was thrown out of the

28

home, Lucas told her that "if it wasn't against the law, sometimes he wished that he could kill [her]."

Moreover, trial counsel were fully aware that Lucas had been diagnosed by Central State Hospital with antisocial personality disorder, and there were hospital records to this effect. Indeed, counsel expressed concern over this diagnosis and how it could be misinterpreted by a jury. And if Aiken had been qualified as a mitigation or social history expert, the door would have been opened to far broader cross-examination by the State. Thus, counsel could well conclude that Aiken, as a mitigation expert, would have done more harm than good. See Evans, 703 F.3d at 1328 (describing as harmful evidence about antisocial personality disorder, and drug and alcohol use).

In short, we are unpersuaded by Lucas's claim that counsel was deficient in the way it attempted to present mitigation evidence through Aiken. A court reasonably could find that presenting Lucas's background through Aiken was part of a reasonable strategy to introduce mitigating evidence without opening the door to related and damaging facts. Finally, we note that though Aiken's testimony was cut short by the trial judge, Lucas did not present any evidence (or any proffer) to the state habeas court concerning what additional testimony Aiken could have provided regarding Lucas's past.

IV.

29

Lucas next claims that he should be granted a new trial because the prosecution violated <u>Brady</u> by failing to disclose a report of a state investigator's interview with an eyewitness, Tim Bentley. The day before jury selection began, the State's chief investigator interviewed Bentley, a witness who saw a red car speeding away from the scene immediately after the crime. Bentley told the investigator that he had nearly smashed into the passenger side of the car, but that the passenger remained slumped in his seat and unresponsive. The investigator prepared a four-page report of the interview that stated the passenger "had slumped down so the driver could see." The Bentley Report was found in the government's files, but the defense did not receive the report until a post-appeal Open Records Act request.

In an affidavit submitted to the state habeas court, Bentley gave a somewhat different account of seeing a passenger with light hair. "His head was propped back with his eyes facing forward, and he was resting his arm out the window." Bentley said that the passenger "never tried to move out of the line of vision of the driver." "He never looked towards the truck, and did not move at all in anticipation of an accident when my truck almost collided into the passenger side of the car."

Under <u>Brady</u>, suppression by the prosecution of evidence favorable to an accused violates due process if the evidence is material to guilt or punishment,

30

regardless of the good faith of the prosecution.  Strickler v. Greene, 527 U.S. 263, 280 (1999).  The materiality prong of this test is met "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985).  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Kyles v. Whitley, 514 U.S. 419, 434 (1995).

Lucas first raised this Brady argument before the state habeas court.  That court said the claim was procedurally defaulted because he did not make a timely objection or raise it on direct appeal.  The habeas court recognized that the petitioner could overcome procedural default if he shows both "adequate cause . . . and a showing of actual prejudice."  Black v. Hardin, 336 S.E.2d 754, 755 (Ga. 1985).  The Georgia rule tracks Strickler, which explained that Brady claims can be procedurally defaulted but that the default may be "excused by an adequate showing of cause and prejudice."  527 U.S. at 282.  Prejudice requires "a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense."  Id. at 289 (internal quotation marks omitted).

The state habeas court held that Lucas could not demonstrate prejudice and

31

thus could not overcome his procedural default. Considering the other witnesses who testified extensively about Lucas's behavior and intoxication on the day of the murders, the state court concluded that testimony from Bentley would have been cumulative at best and that there was no reasonable probability it would have changed the outcome of the suppression hearing or the trial.

We do not apply § 2254(d) AEDPA review, which is reserved for claims adjudicated on the merits, because the state habeas court relied on a procedural bar in rejecting Lucas's Brady claim. When a state court denies a claim as defaulted based on an adequate and independent state procedural rule, a petitioner may not bring the claim in federal habeas unless he can show cause for and actual prejudice from the default. Jones v. Campbell, 436 F.3d 1285, 1304 (11th Cir. 2006). A federal court may also hear a defaulted claim to avoid a fundamental miscarriage of justice. See, e.g., Mincey v. Head, 206 F.3d 1106, 1135 (11th Cir. 2000). Lucas has not invoked that exception, nor would it apply. Lucas claims that his procedural default should be excused because he demonstrated both cause and actual prejudice. The district court found that Lucas failed to establish prejudice. Upon de novo review, we agree.

For prejudice, Lucas must demonstrate a reasonable probability that his conviction or sentence would have been different had the State disclosed the Bentley Report and the identity of Bentley as a potential witness. Strickler, 527

32

U.S. at 280.  We look both to the report itself and to evidence about what Bentley might have testified to at trial.  See Downs v. Sec'y, Fla. Dep't of Corr., 738 F.3d 240, 260 (11th Cir. 2013) (explaining that the identity of a witness is Brady material when that "potential witness would offer or lead to exculpatory or impeaching information favorable to the defendant").  Lucas claims he suffered prejudice because Bentley's story showed the extent of Lucas's intoxication, which prevented him from forming the requisite intent to commit malice murder.  The essential problem is that there is no reasonable probability that Bentley's testimony would have altered the outcome on the intoxication defense because it added little that was new.

During the guilt phase, the jury heard an extensive presentation concerning Lucas's intoxication and mental state at the time of the killings.  The jury learned that Lucas had taken between six and ten Xanax pills hours before the murder, he had been drinking red wine, and he had taken an unknown quantity of Darvocet.  Lucas's friends testified that after the murders Lucas was completely "messed up," "tore down," and was obviously intoxicated from either alcohol or drugs because his speech was slurred and he "couldn't walk straight" -- he was "swaying," rubbing his head, and moving "like he'd been drinking all day."  And, again, an expert witness who specialized in the effects of drug and alcohol, Dr. John Cusack, testified that, due to the effects of Xanax, Darvocet, and alcohol, on the day of the

33

crime Lucas "had to be thoroughly intoxicated." His "memory, concentration, judgment, impulsivity, insight, . . . [and] orientation . . . had to be gravely impaired." With "the amount of drugs that the record showed that this boy took, if he did not possess something called tolerance, he could have easily o.d.'ed on that or been in an emergency room or died." According to Dr. Cusack, "it would be difficult to be able to co-ordinate the making of a sandwich," much less "logically plan out thoughts." His "thoughts were, I think, acting more like a Roman candle, just kind of going off in undirected manners, which would be the case with this type of intoxication."

Moreover, even if Bentley had testified that, from his brief car-to-car observation, a passenger in a red vehicle failed to react to the threat of a crash, it would not have proven that Lucas lacked the requisite mental state when he shot the victims. Indeed, Bentley's account is consistent with the way Lucas himself described his mental state, which was not so compromised as to negate intent: "I know what was happening, but I was just like dazed and can't think." In short, we can discern no reasonable probability that testimony from Bentley would have made Lucas's intoxication defense any more successful than it was.

Lucas also argues that Bentley's testimony would have supported suppression of the videotaped confession because it showed Lucas could not have remembered the crime. But as we've explained Lucas's trial counsel had access to

34

significant evidence of Lucas's intoxication without Bentley.  Bentley's testimony

would not have shown Lucas lacked memory of the shootings.  Moreover, the

strongest signals of the knowing and voluntary nature of the videotaped confession

came from his extensive statements fully captured on tape.  Quite simply, Lucas

has not shown a reasonable probability that Bentley's testimony would have led to

suppression.

Finally, Lucas argues that Bentley would have created residual doubt in the

minds of jurors during the penalty phase, leading them to be less than certain that

Lucas had the requisite mental state or was deserving of death.  Lucas does not

explain how testimony from Bentley would have fueled any more residual doubt

than had already been created by the other evidence presented about the nature and

extent of his intoxication.  The fact that the defense did not have the benefit of

Bentley's testimony does not undermine confidence in the verdict or the sentence.

See Strickler, 527 U.S. at 290.[4]

V.

The petitioner also seeks a new trial because the prosecutor improperly said

during cross-examination that prison escapes happen "every day."  We remain

unpersuaded.  The Georgia Supreme Court's determination, rendered on direct

---

[4] We are equally unpersuaded that the cumulative effect from Lucas's Strickland and Brady claims entitles him to relief.  See Conklin v. Schofield, 366 F.3d 1191, 1210 (11th Cir. 2004) ("[W]e cannot say that [petitioner's] trial, as a whole, was fundamentally unfair and outside of the bounds of the Constitution.").

35

appeal, that any error was harmless was not an unreasonable application of Supreme Court law.  This is especially true since the harmless error standard we apply as a federal habeas court -- that the error is harmless unless there is "actual prejudice," meaning that the error had a "substantial and injurious effect or influence" on the jury's verdict, Brecht, 507 U.S. at 637 -- is more difficult to meet than the one applied by the Georgia Supreme Court.

During the penalty phase, defense expert Aiken opined that "Lucas can be confined in a maximum security prison for the remainder of his life without presenting a harm to staff, other inmates or the community."  On cross-examination, prosecutor Bright attempted to highlight the risk that Lucas would escape by asking whether Aiken would be surprised that escapes occurred at a prison complex in Baldwin County, Georgia, "all the time, every day."  Bright prefaced his question by explaining that he knew about the escapes because he had prosecuted many of the cases.  The trial court overruled defense counsel's objection.  Bright then framed the question this way: "Would it surprise you if inmates -- and when I say escape every day, I mean it's -- it's a very common occurrence."  Aiken squarely rejected Bright's question, offering that "[n]o, they don't oftentimes escape," and explained that prison escapes had been substantially curtailed over the last twenty years.  Aiken also challenged the definition of escape assumed by the prosecutor's question, observing that the prosecutor could be

36

including a number of infractions at lower-security facilities. Thus, for example, an incident could be considered an escape when a prisoner with authorization to leave a low-security prison returns too late, or is in a unauthorized area. Aiken went on to observe that would not be possible at a high-security prison holding Lucas.

To further rebut the prosecutor's questions concerning prison escapes, Lucas's counsel used redirect examination to address the State's line of questioning, pointing out that Georgia prisons were classified in six security levels. Lucas would only be housed in a level six facility because he had committed a heinous crime. He then questioned Aiken about a "Georgia Department of Corrections FY'98 Report," which indicated that "all the prisons that Mr. Bright talked about where they have escaped virtually every day, according to him, they are all level three and four." These lower level security facilities allowed prisoners to leave for work details. Notably, Lucas would not enjoy similar freedoms if sentenced to life imprisonment. Aiken again emphasized that there was "no chance" and "no way" that Lucas would be housed in a reduced-security prison, and instead would be housed in a level six prison.

On recross, the prosecutor returned to the escape theme, asking Aiken whether he would be surprised to learn that numerous murderers had escaped from (the level three and four security) Baldwin County prisons. Aiken pushed back,

37

explaining that some prisoners who committed murder could be held in lower-security prisons than the facilities for those like Lucas who committed "heinous crimes."

After the jury voted for death, Lucas's counsel moved for a new trial based on public records showing that escapes from the prisons referenced by the prosecutor occurred about twice a year, not every day.  The trial court denied the motion.  On direct appeal, Lucas renewed his argument that the prosecutor's comments about "every day" escapes from Georgia prisons had no factual basis and no evidentiary support, and that he had instead personally vouched for them as the District Attorney for the judicial circuit where the trial was held.  The Georgia Supreme Court explained that, though the subject matter -- escape frequency -- was proper for cross-examination because Aiken had raised the issue of prison security, it "[found] merit in the objection Lucas raised asserting that the district attorney had been unclear or had exaggerated in his use of the phrase 'every day' in describing the frequency of escapes."  Lucas, 555 S.E.2d at 449.  "Nevertheless," the Georgia Supreme Court concluded, "considering the trial record, . . . the ensuing exchange between the witness and the district attorney rendered harmless any error in the trial court's not addressing the district attorney's use of hyperbole, particularly because the district attorney himself later clarified that he was using the phrase as an idiom and not literally."  Id.  "Likewise," the court concluded,

38

"any error in the trial court's failure to sustain a later defense objection to the district attorney's 'testifying' in his cross-examination questions was harmless in light of the questions and testimony viewed as a whole." Id.

A prosecutor may not "misstat[e] the facts in his cross-examination of witnesses" or "assum[e] prejudicial facts not in evidence." Berger v. United States, 295 U.S. 78, 84 (1935). Because the average juror generally trusts the prosecutor to pursue justice, "improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." Id. at 88. Nevertheless, improper comments only violate the Constitution if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

We can discern nothing unreasonable in the Georgia Supreme Court's determination that the prosecutor's comments were harmless. That decision was wholly consistent with the United States Supreme Court's refusal to grant relief in Darden and Donnelly, two cases cited by petitioner. In Darden, the prosecutor's closing argument during the guilt phase was problematic in a number of ways: he partially blamed prison officials for the crime because they had released the Defendant on furlough; he implied that the death penalty would be the only

39

guarantee against a similar act; he incorporated the defense's description of the perpetrator of the crime as an "animal"; and he made several offensive comments reflecting an emotional reaction to the case, such as wishing the victim "had had a shotgun in his hand when he walked in the back door and blown his [Darden's] face off.  I wish that I could see him sitting here with no face, blown away by a shotgun."  Darden, 477 U.S. at 179, 180 & n.12 (internal quotation mark omitted).

Though the Supreme Court found that the prosecutor's argument deserved "condemnation," id. at 179, it held that his comments "did not deprive petitioner of a fair trial," id. at 181.   The prosecutor did not "manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent."  Id. at 182.  "Much of the objectionable content was invited by or was responsive to the opening summation of the defense."  Id.  And "[t]he trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence."  Id.  Finally, defense counsel "were able to use the opportunity for rebuttal very effectively, turning much of the prosecutors' closing argument against them by placing many of the prosecutors' comments and actions in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner."  Id.  As a result, the Supreme Court found "Darden's trial was not perfect -- few are -- but neither was it fundamentally

40

unfair." Id. at 183 (internal quotation marks omitted).  It is undeniable that the prosecutor's questions/comments about escape in this case were far less egregious than what was said by the prosecutor in Darden.  Moreover, counsel had every opportunity to and did vigorously redirect the witness about the unlikelihood of escape from the type of Georgia prison that might house Lucas.  The Georgia Supreme Court's determination was not an unreasonable application of Darden.

The Supreme Court also denied relief in Donnelly, when a prosecutor told a jury during closing argument that the defendant and his counsel hoped that the jury would "find him guilty of something a little less than first-degree murder."  416 U.S. at 640 (internal quotation mark omitted).  The Supreme Court found that "the prosecutor's remark here, admittedly an ambiguous one, was but one moment in an extended trial and was followed by specific disapproving instructions."  Id. at 645.  The Court concluded that, "[a]lthough the process of constitutional line drawing in this regard is necessarily imprecise, we simply do not believe that this incident made respondent's trial so fundamentally unfair as to deny him due process."  Id. (emphasis added).  Again, nothing in Donnelly suggests that the Georgia Supreme Court's determination on this point in this case was an unreasonable one.

Moreover, the Supreme Court recently explained in Parker the meaning of its holding in Darden.  Reversing a grant of habeas relief when a prosecutor commented during closing argument that the defendant had colluded with his

41

lawyer in manufacturing a defense, the Supreme Court observed, "even if the comment is understood as directing the jury's attention to inappropriate considerations, that would not establish that the [state court's] rejection of the Darden prosecutorial misconduct claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (quoting Harrington, 131 S. Ct. at 786-87). "Particularly because the Darden standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations,' the Sixth Circuit had no warrant to set aside the [state] Supreme Court's conclusion." Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).[5]

Quite simply, the Georgia Supreme Court's harmless-error determination was not contrary to or an unreasonable application of the Supreme Court's "necessarily imprecise" rule. Here, the factors identified in Darden and Donnelly cut in different directions. On the one hand, the prosecutor arguably interjected facts about escape not in evidence, albeit in the form of a series of questions. On the other, the comments were limited to the cross-examination and recross of

---

[5] Lucas would have us consider our own precedents, and those of other Circuits, in our analysis. Section 2254(d) forbids this practice. See, e.g., Lopez v. Smith, __ S. Ct. __, No. 13-946, 2014 WL 4956764, *1 (Oct. 6, 2014) ("We have emphasized, time and again, that [AEDPA] prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'"); Parker, 132 S. Ct. at 2155 ("The Sixth Circuit also erred by consulting its own precedents, rather than those of this Court, in assessing the reasonableness of the Kentucky Supreme Court's decision.").

Aiken as a corrections expert witness. Moreover, the responses of Aiken, as well as redirect by defense counsel, mitigated any potential prejudice by making clear that the prisons the prosecutor said were plagued by every-day escapes had looser restrictions than the maximum-security facilities Lucas would face. We add that the prosecutor made no mention of the likelihood of escape from prison in his closing argument. And the trial judge charged the jurors during the guilt phase that facts must be proven through evidence, which includes the testimony of witnesses but not arguments from attorneys. On this record, a reasonable jurist could fairly conclude that the prosecutor's questions about escape did not so taint the penalty phase as to violate due process. And, at the very least, we cannot say that the error had a "substantial and injurious effect or influence" on the jury's verdict. Brecht, 507 U.S. at 637.

Lucas also argues that the Georgia Supreme Court unreasonably found that the prosecutor had used the term "every day" as an idiom instead of literally. But there can be little doubt that the prosecutor did not suggest that escapes happened on every single day, especially because he explained "when I say escape every day, I mean it's -- it's a very common occurrence." If we view the Georgia Supreme Court's inference about this as being a finding of fact, Lucas has not met his burden of rebutting the presumption of correctness we must afford it by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Nor has he shown that the Georgia

43

Supreme Court's decision was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding.." 28 U.S.C. § 2254(d)(2).

VI.

Finally, Lucas complains that the trial court failed to instruct the jury that mitigating factors need not be found unanimously. Lucas cannot prevail because the Georgia Supreme Court's decision on the adequacy of the instructions was not contrary to or an unreasonable application of the Supreme Court precedents he cites, Mills v. Maryland, 486 U.S. 367 (1988), and McKoy v. North Carolina, 494 U.S. 433 (1990).

In Mills, a prisoner sentenced to death challenged his sentence because the jury instructions and verdict form used by the Maryland trial court had prohibited jurors from considering mitigating evidence unless the entire jury unanimously found that a mitigating factor existed. The verdict form stated: "Based upon the evidence we unanimously find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist by a preponderance of the evidence and each mitigating circumstance marked 'no' has not been proven by a preponderance of the evidence." Mills, 486 U.S. at 387 (emphasis omitted). The Supreme Court held that "the sentencer must be permitted to consider all mitigating evidence," regardless of whether a factor was found unanimously. Id. at 384. The Court vacated the death sentence in Mills because the jury instructions

44

and verdict form created "a substantial probability that reasonable jurors . . . well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." Id.

Two years later in McKoy, the Supreme Court applied Mills to strike down a North Carolina unanimity requirement that prevented a capital jury from considering any mitigating factor it did not unanimously find. McKoy, 494 U.S. at 436. The judge had instructed the jury: "If you do not unanimously find [a] mitigating circumstance by a preponderance of the evidence, so indicate by having your foreman write, 'No,' in that space." Id. Similarly, the verdict form read: "In the space after each mitigating circumstance, write 'Yes,' if you unanimously find that mitigating circumstance by a preponderance of the evidence. Write, 'No,' if you do not unanimously find that mitigating circumstance by a preponderance of the evidence." Id. The Supreme Court held that, under Mills, "North Carolina's unanimity requirement violates the Constitution by preventing the sentencer from considering all mitigating evidence." Id. at 435. In fact, the Court noted, McKoy was "an even clearer case for reversal than Mills" because in Mills "the Court divided over the issue whether a reasonable juror could have interpreted the instructions in that case as allowing individual jurors to consider only mitigating circumstances that the jury unanimously found." Id. at 444 n.8. "In this case, by contrast, the instructions and verdict form expressly limited the jury's

45

consideration to mitigating circumstances unanimously found." Id.

Here, the trial court's jury instructions and verdict form contained no statement that reasonably could be read by jurors to require unanimity on mitigating factors. And Lucas can point us to no Supreme Court precedent clearly establishing that an affirmative instruction must be given when the trial court has not otherwise suggested that unanimity is mandatory. Moreover, as the Georgia Supreme Court concluded on direct review, the trial judge in fact "charged the jury that it could impose a life sentence for any reason or no reason." Lucas, 555 S.E.2d at 450 (emphasis added). Any reasonable juror would have known from these instructions that she was free to vote for life imprisonment for any reason she chose, regardless of whether other jurors found the existence of mitigating factors. Unlike in Mills and McKoy, there was no danger that a reasonable juror would have felt compelled to vote for death if she were moved by a mitigating factor not found by another juror. The Georgia Supreme Court did not contradict or unreasonably apply these cases in denying relief.

**AFFIRMED.**

46